RICHARD O'DONNELL, PLAINTIFF-APPELLANT, v. AS-PLUNDH TREE EXPERT CO., ALSO KNOWN AS THE ASPLUNDH CO., A CORPORATION, DEFENDANT-RE-SPONDENT.

Argued September 9, 1953—Decided October 5, 1953.

320

*Mr. Sidney M. Schreiber* argued the cause for the appellant (*Messrs. McKeown, Schreiber, Lancaster & Demos*, attorneys; *Mr. Roger F. Lancaster*, on the brief).

*Mr. James B. Emory* argued the cause for the respondent (*Messrs. Emory, Langan & Lamb*, attorneys; *Mr. Richard A. Dunne*, on the brief).

The opinion of the court was delivered by VANDERBILT, C. J.

## I.

The plaintiff was a tree clearance man employed by the East Orange Shade Tree Commission. While he was 50 feet above the ground pruning a tree, supported by his climbing rope crotched in the tree 20 feet above him, the metal hook that secured his safety belt to the rope snapped as he was making a swing to another part of the tree, causing him to plunge to the ground. He instituted suit against the Meeker Foundry Company which had made the fractured casting, the Covert Manufacturing Company which had assembled the hook by attaching a clip and a spring to the casting, and the Asplundh Tree Expert Company, also known as The Asplundh Co., the supplier which sold the hook to the East Orange Shade Tree Commission. At the conclusion of the plaintiff's case involuntary judgments of dismissal were entered in favor of all the defendants. The plaintiff appealed against Asplundh only to the Appellate Division of the Superior Court, where a divided court affirmed the judgment below. From this judgment the plaintiff has appealed to this court.

It has been stipulated that the issue was whether the defendant failed in its duty of care to plaintiff "in negligently assembling, testing, and inspecting the aforesaid safety clip or snap, and further negligently represented that this safety hook or snap was adequate to be used as a safety hook or snap for use by tree trimmers." It appears that the Covert Manufacturing Company, which assembled the hook, ordered its castings from the Meeker Foundry Company by submitting a brass pattern. No specifications were furnished as to the desired tensile strength, the properties of the metal to be used, or the carbon content of raw material. The president of Meeker testified that although an analysis of its pig iron and home scrap supply was made daily, no analysis is made of the melt prior to casting. In this regard he stated:

"Ordinarily we charge about 40 per cent pig iron and the balance is home scrap which, of course, is almost entirely the gates and risers and runners from our previous day's melt. Then in order to control the silica content steel may be put in the melt or it may not be in the melt. Usually there is a small amount of steel."

Upon receipt of the casting Covert completed its assembly job by riveting a spring and clip to the casting. No tests were conducted to determine the tensile strength of its product, the only inspection being made by an employee who made a brief physical examination of each hook, worked the snap and either approved or rejected it. Covert has sold this particular article known as Hook No. 850 since prior to 1900, when it was originally designed for use in the harness trade. It does not appear that Covert made any representation that the hook was suited for any other purpose. Its catalogue No. 48 which lists this particular item as a Yankee Center Snap describes Covert as dealing in "Hardware for harness, saddlery, leather or web straps, chain and rope, and horse and mule jewelry." The foreword to the catalog states that "we have, therefore, made arrangements to supply full information, such as dimensions, approximate tensile

strength, and data on materials and finishes available. We invite inquiries."

Asplundh Tree Expert Company, which was itself engaged in the line clearance business, did on occasion sell equipment to shade tree commissions. On December 4, 1946 Mr. Ralph I. Kauffman, then director of training at Asplundh, conducted a lecture in Newark, attended by several hundred persons including Mr. Harry E. Turner, Secretary-Forester of the East Orange Shade Tree Commission. Movies were shown by Mr. Kauffman which demonstrated Asplundh's tree climbing and clearance technique through use of the hook in question, which was characterized by Mr. Kauffman in his lecture as "a time saver as well as a safety hook." In answer to an inquiry as to the safety factor of the hook Mr. Kauffman replied:

"I don't know, we never had one break. I think if it were to break it would be a fault in the snap itself. It won't break from the way you put it on. I believe the rope would break before the snap."

When asked if the hook was made of malleable steel he stated:

"Yes, there will be some of these outside. You can look at them. We have never had a snap break."

At the trial Mr. Kauffman testified that he didn't know whether it was made of malleable steel or malleable iron. In reply to a question "where do you have them made" he stated "we have them made up for ourselves." Asplundh had used this type of hook successfully for many years. The usual equipment of a tree climber, including that of the employees of the East Orange Shade Tree Commission, was a climbing rope and belt or saddle. The rope, which was crotched in the tree above the climber, was tied to the D-rings of the saddle, and in the event the climber wished to descend the tree it was necessary to untie the rope in order to free himself. Asplundh, on the other hand, used hooks on their saddle so that the climber in order to extri-

cate himself need only to unfasten the hook from the D-rings and thus leave the rope hanging in place.

After the lecture Mr. Turner made inquiries of Mr. Kauffman concerning the use of these hooks, and as a result ordered two dozen from Asplundh, delivery of which was received on February 11, 1947. One of the hooks was issued to the plaintiff in March 1947 and was used by him until February 1950, when it was discarded because the clip had become loose. A brand new hook was then issued and on March 30, 1950 the accident in question occurred as a result of the breaking of this hook.

On November 29, 1949 Asplundh had written Covert Manufacturing Company requesting a catalog and also information as to the possibility of acting as Covert's sales representative for tree climbing equipment. Covert's reply, dated December 7, 1949, approximately four months prior to this accident, was as follows:

"Gentlemen :

We are pleased to acknowledge your letter of November 29 and wish to advise you that our line is normally distributed through wholesale hardware jobbers. However, we do have one or two distributors selling certain items to the dairy trade and it is possible that you could handle certain items to the particular trade that you serve.

Under separate cover we are sending a copy of our catalog. *   *   *

*None of our snaps are drop forged or suitable for safety equipment* but many of them are used for hanging accessories on linemen's belts and for ropes and other types of equipment *not requiring critical loads.* *   *   *

Yours very truly,
COVERT MANUFACTURING COMPANY"

(Emphasis added)

Mr. Covert testified that the statement as to the use of the hook had been inserted because "we have been asked on occasion to furnish some of our products for window washing equipment and linemen's equipment where we knew the snap may be used so that somebody will be dependent on the snap with their whole weight; therefore we advised that this snap was made of malleable iron and not drop forged

and we would not sell this for that purpose, for use with human beings."

Asplundh made no inquiry as to the suitability of this particular type of hook for use in tree climbing. No tests were conducted to determine the tensile strength of the hook. Asplundh was never advised by Covert, or any one else, that the hook could be used otherwise than in connection with harness equipment.

Mr. William H. Smith, a professional engineer and chief of the Engineering and Inspection Department of the United States Testing Company, Inc., and an expert in metallurgy and micrography, testified on behalf of the plaintiff. His opinion and conclusion, based on a thorough microscopic examination of the broken hook, were as follows:

"It was my conclusion first that the material definitely is a malleable iron casting and has not been subjected to forging. Secondly that the portion of the hook at the point of probable greatest strain in the sudden application of a load, that at that area, there was at that point a rupture, there was a brittle area, an area in which the malleableizing treatment had not been carried out perfectly or with complete success and that that constituted a latent defect in the material of which the hook was made. * * *

I think that the way this particular article failed under a suddenly applied or jerk load illustrates the reason why a malleable casting is not the best material for this type of use and that the forging would be much more effective."

He stated that where support of the body was involved he would "expect to encounter forged material," because "forged material, first of all it starts out as steel instead of cast iron, therefore it is more perfectly controlled in its manufacture right from the start. Secondly, the forging operation might disclose bad imperfections, it definitely works the material and produces toughness. The point in issue here is not tensile strength, it is toughness, lack of brittleness. Forging will give you high tensile strength plus lack of brittleness, plus toughness."

In affirming the judgment of dismissal the Appellate Division held that there was no duty upon Asplundh to dis-

cover a latent defect. The question confronting us is whether the defendant as a supplier or vendor can be liable for injuries resulting from the latent defect in an article sold by it but manufactured by a third party.

## II.

In the absence of statutory directives to the contrary, negligence is not presumed, but must be established by competent proof, *Callahan v. National Lead Co.*, 4 *N. J.* 150, 153 (1950); and where fair-minded men might honestly differ as to the conclusions to be drawn from the proofs, the question at issue must be submitted to the jury, *Antonio v. Edwards*, 5 *N. J.* 48, 52 (1950). And where, as here, we are concerned with a judgment of involuntary dismissal, the court must accept as true all the evidence that supports the position of the party against whom the motion is made, and it must give him the benefit of all the inferences in his favor that may logically and legitimately be drawn therefrom, *McKinney v. Public Service Interstate Transportation Co.*, 4 *N. J.* 229, 243 (1950).

The tort liability of a manufacturer and of a supplier of goods has been receiving increasing judicial attention. In 1842 the English Court of Exchequer decided the leading case of *Winterbottom v. Wright*, 10 *M. & W.* 109, 152 *E. R.* 402, where a driver of a mail coach sued for damages sustained due to the defendant's failure to properly maintain and repair the coach. The action was based on the defendant's contract with the postmaster general to keep the vehicle in proper repair for the purpose of conveying the royal mail over a prescribed route. The court held that the defendant's breach of contract gave no cause of action to one who was not a party thereto. Baron Alderson expressed his fear that if one not a party to the contract were allowed to recover "there is no point at which such action would stop." Therefore he concluded that the only safe rule was "to confine the right to recover to those who enter into the contract." Lord Abinger, the Chief Baron, shared his fears:

"If the plaintiff can sue, every passenger or even any person passing along the road, who was injured by the upsetting of the coach, might bring a similar action. Unless we confine the operation of such contracts as this to the parties who entered into them, the most absurd and outrageous consequences, to which I can see no limit, would ensue."

Although the *Winterbottom* case held merely that no action could be brought on the contract itself by one not a party thereto, it was universally misinterpreted to mean that the original seller was not liable, except to his immediate buyer, even in tort for damages caused by defects in the article sold. *Prosser on Torts* (1941), 673. Thus the case was cited with approval in *Marvin Safe Co. v. Ward*, 46 *N. J. L.* 19 (*Sup. Ct.* 1884), where plaintiff brought an action on the case for negligence against a contractor who had constructed a temporary bridge for the Boards of Chosen Freeholders of Essex and Hudson Counties. The suit was based upon the defendant's obligations arising out of its contract with the boards to construct a bridge suitable and proper for public travel. The court upheld the entry of a judgment for the defendant on the pleadings, reasoning that the contract did not "create any duty or liability on the part of the other contracting party, except such as arises *inter sese* from the terms of the contract." (at *page* 27) This kind of judicial reasoning is not uncommon where attention is concentrated on the technicalities of forms of action and procedural distinctions between rights arising out of contracts or out of torts, rather than on the rights and liabilities of the parties in terms of substantive law.

· The courts soon realized the fallacy of such a broad rule and gradually developed various exceptions to it. Thus, where the seller knew the chattel was inherently dangerous, he was liable for negligence to those who might reasonably be expected to come in contact with it. Accordingly, in *Thomas v. Winchester*, 6 *N. Y.* 397, 409 (1852) the New York Court of Appeals held that a manufacturer of drugs and medicines who carelessly labeled a deadly poison as a

harmless medicine and sent it so labeled into the market was liable to those who were injured by using it:

"The death or great bodily harm of some person was the natural and almost inevitable consequence of the sale of belladonna by means of the false label. * * *"

"The defendant's negligence put human life in imminent danger. Can it be said that there was no duty on the part of the defendant, to avoid the creation of that danger by the exercise of greater caution? or that the exercise of that caution was a duty only to his immediate vendee, whose life was not endangered? The defendant's duty arose out of the nature of his business and the danger to others incident to its mismanagement. Nothing but mischief like that which actually happened could have been expected from sending the poison falsely labeled into the market; and the defendant is justly responsible for the probable consequences of the act."

This case was cited with approval in *Van Winkle v. American Steam Boiler Co.*, 52 *N. J. L.* 240, 247 (*Sup. Ct.* 1890), as a typical instance of the duty imposed upon a person who undertakes the performance of an act which, if not done with care and skill, will be dangerous to the persons or lives of others. In that case the plaintiff was the owner of premises adjacent to a paper mill in which there was a boiler that the defendant not only insured but also had the duty to manage and inspect. The boiler burst and as a result plaintiff's property was damaged. The court held that the defendant's demurrer to the declaration must be overruled, because "in all cases in which any person undertakes the performance of an act, which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto*, imposes, as a public duty, the obligation to exercise such care and skill."

Our courts, moreover, have had no difficulty in imposing on canners and manufacturers of food a duty to exercise care in seeing that the food is wholesome and fit for consumption. In *Tomlinson v. Armour & Co.*, 75 *N. J. L.* 748, 762 (*E. & A.* 1908), reversing 74 *N. J. L.* 274 (*Sup. Ct.* 1907), the plaintiff was stricken with ptomaine poisoning after eating a piece of ham canned by the defendant and purchased from

a retail dealer. The defendant's demurrer to the declaration was overruled:

"Upon both reason and authority we are clearly of the opinion that the declaration before us sets up a good cause of action. The fact that the defendant was the manufacturer, presumably having knowledge, or opportunity for knowledge, of the contents of the cans and of the process of manufacture; that it put the goods upon the market for sale by dealers to consumers, under circumstances such that neither dealer nor consumer had opportunity for knowledge of the contents; the fact that the goods were thus manufactured and marketed under circumstances that imported a representation to intending purchasers that they were fit for food and beneficial to the human body; that in the ordinary course of business there was a probability (it being, indeed, the very purpose of the defendant) that the goods should be purchased, and used by parties purchasing, in reliance upon the representation; and that the defendant negligently prepared the food so that it was unwholesome and unfit to be eaten, and poisonous to the human body, whereby the plaintiff was injured—make a case that renders the defendant liable for the damages sustained by the plaintiff thereby."

See *DeGroat v. Ward Baking Co.*, 102 *N. J. L.* 188 (*E. & A.* 1925); *Cassini v. Curtis Candy Co.*, 113 *N. J. L.* 91 (*Sup. Ct.* 1934).

As various exceptions to the *Winterbottom* rule developed, the state of the law became very confused. Thus, as remarked by Mr. Justice Swayze in his opinion for the Court of Errors and Appeals in *Styles v. Long Co.*, 70 *N. J. L.* 301, 303 (1904), "Whether, in any particular case, a right of action in favor of third persons exists, is a question of difficulty, upon which the cases are hard to reconcile upon general principles."

In 1916 the New York Court of Appeals handed down its famous decision in *MacPherson v. Buick Motor Co.*, 217 *N. Y.* 382, 385, 111 *N. E.* 1050, 1053, *L. R. A.* 1916 *F*, 696, where, as Dean Prosser puts it, Judge Cardozo's opinion "struck through the fog of the 'general rule' and its various exceptions, and held the maker liable for negligence." *Prosser on Torts* (1941), 677. In that case the plaintiff purchased from a retail dealer an automobile manufactured by the defendant. While riding in the car the plaintiff was

injured when one of the wheels, which was made of defective wood, crumbled and he was thrown to the ground. Although the wheel was not made by the defendant, there was evidence that its defects could have been discovered by a reasonable inspection. The action was based on negligence and judgment was entered for plaintiff. Judge Cardozo, while aware of decisions to the contrary, affirmed the judgment below, saying:

"If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully. * * *

"In such circumstances, the presence of a known danger, attendant upon a known use, makes vigilance a duty. We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law."

This case clearly established the rule that a manufacturer is liable under ordinary principles of the law of torts for negligence in placing upon the market a defective product which, although not inherently dangerous, could be dangerous when put to the intended use.

The *MacPherson* case was approved in New Jersey in *Martin v. The Studebaker Corp.*, 102 *N. J. L.* 612 (*E. & A.* 1926), where the factual situation was similar. In *Heckel v. Ford Motor Co.*, 101 *N. J. L.* 385 (*E. & A.* 1925), the plaintiff sued to recover damages for personal injuries and losses sustained as a result of the bursting of a pulley attached to a tractor manufactured by the defendant. It was held that a jury question was presented and that the trial court was correct in denying defendant's motion for a non-suit:

"The manufacturer of an article, not inherently dangerous, but which may become dangerous when put to the use for which it is intended, owes to the public the duty of employing care, skill, and

diligence in its manufacture and of using reasonable diligence to see that it is reasonably fit for the purpose for which it was intended. * * *" (at *page* 387)

"The manufacturer of an appliance, that will become highly dangerous, when put to the uses for which it is designed and intended, because of defects in its manufacture, owes to the public a duty, irrespective of any contractual relation, to use reasonable care in the manufacture of such appliance, and such duty calls for and requires the exercise of reasonable care in applying reasonable tests to detect defects and deficiencies in the appliance. This duty is not met by a showing that reasonable tests are required, but it must appear that such tests were applied and their application was made in a reasonably careful manner." (at *page* 389)

Similarly in *Clark v. Standard Sanitary Manufacturing Co.,* 8 *N. J. Misc.* 284 (*Sup. Ct.* 1930), the plaintiff, who was a tenant, recovered for injuries sustained as a result of the breaking of a defective faucet handle manufactured by the defendant.

Nor has this liability been limited to manufacturers. In *Slavin v. Francis H. Leggett & Co.,* 114 *N. J. L.* 421 (*Sup. Ct.* 1935), affirmed 117 *N. J. L.* 101 (*E. & A.* 1936), the plaintiff while eating peas bit on a piece of stone and broke or damaged some teeth and a dental plate. He had purchased the can of peas bearing the label "Francis H. Leggett & Co., Distributors, New York, U. S. A." at a local store. The defendant's registered trade name, "Premier—the Guarantee of Quality," was on the can. The peas were packed by a California packing company, from whom they were purchased by the defendant and distributed under its own label. Judgment for the plaintiff was affirmed, the court stating at *page* 424 that "it is fair to say that its conduct has been such that it might be held to have adopted this product as its own and to have made itself responsible for the acts of the undisclosed packer of its own selection." See *Thornhill v. Carpenter-Morton Co.,* 220 *Mass.* 593, 103 *N. E.* 474 (*Sup. Jud. Ct.* 1915) ; *Burkhardt v. Armour & Co.,* 115 *Conn.* 249, 161 *A.* 385, 90 *A. L. R.* 1260 (*Sup. Ct. Err.* 1932) ; *Swift & Co. v. Blackwell,* 84 *F. 2d* 130 (*C. C. A.* 4 1936). These decisions are in accord with *section* 400 of the *Restatement of the Law of Torts* providing that:

"One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

This duty to use reasonable care has been extended to vendors and suppliers generally, who, although not always held to the same degree of care as the manufacturer is, nevertheless are charged with the duty of using reasonable care where in all the circumstances of the case the particular article is likely to be dangerous when put to the intended use. *Section* 401 of the *Restatement of the Law of Torts* (1948 *Supplement*) enunciates this principle:

"A vendor of a chattel manufactured by a third person who has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the vendor should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them."

And under *comment* (c) to this section the reporter states:

"*Source of Supply*. Many chattels are things of danger when not properly made. To persons who deal in such chattels the known reputation of the manufacturer is an important fact. A vendor who buys goods of a type which he knows are dangerous when defective and who buys them from an unknown manufacturer, or one of dubious reputation, may not know that the chattels are dangerously defective, but he does know they may be. In such a situation, the vendor knows that he does not know the condition of the chattel and he has no reasonable grounds for believing the chattel to be free of dangerous defects. A vendor who sells such a chattel without a warning of its uncertain quality has reason to know that the chattel is likely to be dangerous.

Illustration :

1. A, a retail merchant, buys a case of hair dye lotion from an unknown itinerant peddler. The lotion contains excessive chromic acid solution and is dangerous for use, though this could only be discovered by chemical analysis. B purchases a bottle of the lotion from A. B and C, her sister, use the lotion and are harmed by it. A is liable to B and to C."

This illustration is derived from *Watson v. Buckley,* 1 *All Eng. Rep.* 174 (1940). *Section* 399 of the *Restatement of the Law of Torts* provides:

"A vendor of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be dangerous, is subject to liability as stated in Sections 388 to 390."

See also *State to Use of Bond v. Consolidated Gas, Elec. L. & P. Co.,* 146 *Md.* 390, 126 *A.* 105, 42 *A. L. R.* 1243; *Kramer v. Mills Lbr. Co.,* 8 *Cir.,* 24 *F.* 2d 313, 60 *A. L. R.* 371. In *Kafton v. Wickberg,* 120 *N. J. L.* 417 (*Sup. Ct.* 1938), affirmed 121 *N. J. L.* 586 (*E. & A.* 1939), and in *Roberts v. George M. Brewster & Son, Inc.,* 13 *N. J. Super.* 462 (*App. Div.* 1951), cert. denied 7 *N. J.* 582 (1951), the plaintiff recovered damages against a lessor of defective equipment. Similarly in *Steamship Co. v. Ingebregsten,* 57 *N. J. L.* 400 (*E. & A.* 1894), an administrator recovered damages against her decedent's employer who had supplied him with defective equipment. This is in accordance with *section* 388 of the *Restatement of the Law of Torts:*

"One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied;

(b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

See 89 *U. of Pa. L. Rev.* 306, 45 *Dickinson L. Rev.* 159 and 269, 4 *Rutgers L. Rev.* 419, 479.

There is no doubt in the case at bar but that the hook in question when put to the use intended by the defendant would become dangerous to human life and that therefore the defendant, as the supplier and vendor, was under the duty

of reasonable care to make it safe for the intended use. The defendant, however, contends that this duty does not extend to the discovery of a latent defect, relying on *Moran v. Moore-McCormack Lines,* 131 *N. J. L.* 332 (*Sup. Ct.* 1944), affirmed 132 *N. J. L.* 171 (*E. & A.* 1944). That case is clearly distinguishable, however, since the defendant there was neither a manufacturer nor vendor and certainly could not be held liable for the existence of latent defects in a loading skid which it had loaned to the plaintiff. The alleged defect was in an eye bolt that had rusted and rotted so that it was in a very weak condition. The non-suit there was granted by the plaintiff's failure to produce any facts from which negligence could reasonably be inferred.

There is, of course, no hard and fast rule as to latent defects. Where, as here, a potentially dangerous article is sold, the vendor must use reasonable care in placing it on the market, and what is reasonable care depends upon all the facts of the case. The question often arises in cases where a servant is injured by some defect in a tool or in equipment furnished by an employer. In *Carroll v. The Tidewater Oil Co.,* 67 *N. J. L.* 679 (*E. & A.* 1902), plaintiff sued his employer for personal injuries sustained while moving a large machine. When the machine had been taken by the plaintiff and his fellow employees to its proper location and while the plaintiff was helping to raise it upon a platform the fly wheel attached to the machine fell and landed upon the plaintiff's foot. The court held that a jury question was presented as to defendant's negligence:

"If the defect in the putting of this wheel upon the shaft was one that could not have been discovered by careful and diligent examination, no responsibility would attach to the master; but he would be liable for a latent defect, which, by the exercise of the care and diligence required of him, he might have discovered." (at *page* 683)

In *Stassell v. Taylor Iron and Steel Co.,* 82 *N. J. L.* 631, 632 (*E. & A.* 1912), the plaintiff, an employee of the defendant iron manufacturing company, was injured by the falling of a machine which he was removing from a railroad car. The

cause of the action was a latent defect in an eye bolt. Judgment for the defendant was directed by the trial court and the Court of Errors and Appeals affirmed, saying:

"The gravamen of the action, as set forth in the declaration, is that the ·defendant negligently failed to inspect the machine or to warn the plaintiff of such latent defect, which was known, or ought to have been known, to the defendant, and was unknown to the plaintiff.

· Now the general rule is that a master is not liable for injuries resulting to a servant by reason of a latent defect of which he was ignorant, and which could not be discovered in the exercise of reasonable care and diligence. 26 *Cyc.* 1145.

The allegation that the latent defect in the bolt was known to the master has no proof to support it.

Nor do we think there was any evidence that reasonable care in inspection would have disclosed the defect, and, in the absence of such evidence, the mere failure to inspect would not warrant holding the master liable. *Atz v. Newark Lime, &c., Co.*, 59 *N. J. L.* 41; *Essex County Electric Co. v. Kelly*, 57 *N. J. L.* 100.

Reasonable care in the matter of inspection, when inspection is required, requires the master to make such an examination and test as a reasonably prudent man would deem necessary under the same circumstances for the discovery of possible defects, and he is not required, unless put upon notice as to possible existence of defects, to employ unusual or extraordinary tests. 26 *Cyc.* 1139.

The defendant had no manner of notice of the possible existence of the latent defect in the bolt, and plainly it was of such a character that an examination, such as an ordinarily prudent man would deem necessary, would not have disclosed it." (82 *N. J. L.* at *page* 632)

The test is whether on the facts of the particular case reasonable care would discover the latent defect, *Bauman v. Cowdin,* 75 *N. J. L.* 193, 196 (*Sup. Ct.* 1907), affirmed 76 *N. J. L.* 575 (*E. & A.* 1908); *Barrett v. Young,* 78 *N. J. L.* 733, 736 (*E. & A.* 1910). And in determining the amount of inspection necessary the dangerous propensities of the article involved are, of course, to be considered, *Hopper v. Charles Cooper & Co.*, 104 *N. J. L.* 93 (*E. & A.* 1927); *Herz v. duPont de Nemours & Co.*, 99 *N. J. L.* 407 (*E. & A.* 1924).

In the case at bar the defendant was not merely a vendor and supplier. It had without inquiry or proper investigation taken upon itself the sale of the hook in ques-

tion for use in sustaining the weight of a man's body. It alone had decided that this particular hook was suitable for tree clearance work. Neither the manufacturer which assembled the hook nor the foundry which made the casting had given any indication that the hook could support the weight of a man's body, and in fact if inquiry had been made the defendant would have discovered that it was not suited for such a purpose. This is quite a different case from those wherein the vendor or supplier acts as the mere middleman, passing on the product of a reputable manufacturer. *Cornelius v. B. Filippone & Co. Inc.*, 119 *N. J. L.* 540 (*Sup.* 1938). And it is a far cry from the case where the employer supplies his employee equipment manufactured by a reputable company to be put to the intended use, *Stassett v. Taylor Iron and Steel Co.*, *supra*, 82 *N. J. L.* 631. It is also an entirely different case from those wherein the vendor is an assembler, or even a manufacturer, who utilizes parts manufactured by a third party, when the parts are intended for the purpose to which they are devoted by the vendor, *Martin v. The Studebaker Corp.*, *supra*, 102 *N. J. L.* 612. In those cases the duty of reasonable inspection may not make the vendor or supplier liable for latent defects. Here, on the contrary, the defendant without proper investigation or testing applied an article manufactured for use with harness equipment to a use in connection with tree climbing equipment, where obviously human lives would depend upon its strength and durability.

Reasonable care requires that the article so chosen be constructed as to perform the task to which it is dedicated. Here there was evidence that the material used, malleable iron, was not satisfactory for this particular job, that it was not the proper metal to be used where a man's life would depend upon its effectiveness. In effect, the defendant had assumed the liability of a manufacturer when he sold the hooks for a use never intended by the manufacturer. He was therefore under a duty to ascertain that the article was made of proper raw materials and was so manufactured as to sustain the weight of a man's body. See *comment* (*k*) under *section*

388 of the *Restatement of the Law of Torts* (1948 *Supplement*). It is clear that a jury question was presented as to whether the defendant failed to exercise reasonable care when he neglected to discover the latent defect.

There are two other factors in the case that lead us to the same conclusion. First are the statements made by the defendant's representative, Mr. Kauffman, at the lecture on December 4, 1946. He said that the hooks were made of steel and that "we have them made up for ourselves." Although Mr. Kauffman on cross-examination testified that by the latter remark he was referring to the saddle, it is clear that the representative of the East Orange Shade Tree Commission believed otherwise and was induced to purchase the hooks by reason of this statement, as well as others, made by Mr. Kauffman. As to the statement that the hook was made of steel, Mr. Kauffman testified that actually he didn't know if it was made of iron or steel, a very important difference according to the testimony of the expert witness. See *Restatement of the Law of Torts* (1948 *Supplement*), *sec.* 401, *comment* (*e*), as to misrepresentations made by vendors. Such representations, although not constituting a warranty, are a factor to be considered in determining the defendant's negligence.

Secondly, Covert's letter of December 7, 1949, approximately four months prior to the accident, placed the defendant on notice that "none of our snaps are drop forged or suitable for safety equipment" and that they are used only in connection with equipment "not requiring critical loads." Apparently the defendant did nothing in the way of notifying the East Orange Shade Tree Commission or any other purchasers of the unsuitability of these hooks for use with safety equipment, although it was clearly informed of the possible danger of these hooks when put to such a use.

The Appellate Division of the Superior Court gave no effect to this letter, holding that the plaintiff alleged no cause of action arising out of any such omission of duty by the defendant. In this regard the Appellate Division erred.

The stipulation amending the complaint charged the defendant with "insufficiently assembling, testing, and inspecting the aforesaid safety clip or snap, and further negligently represented that this safety hook or snap was adequate to be used for a safety hook or snap for use by tree trimmers." The pretrial order provided that "This suit is as pleadings indicate predicated solely on negl and no question of warranty, express or implied. Issues negl, contr. negl and assumption of risk. The above statement is not supposed to supplant the issues in the pleadings." The correspondence was admitted into evidence without objection. The purpose of our rules is to promote justice, while eliminating unnecessary technicalities and forms, *Evans v. Rosenberg*, 1 *N. J.* 590, 596 (1949). The following rules are pertinent: *R. R.* 4:8-1 (formerly *Rule* 3:8-1):

"A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (a) a statement of the facts on which the claim is based showing that the pleader is entitled to relief, and (b) a demand for judgment for the relief to which he deems himself entitled. Relief in the alternative or of several different types may be demanded."

*R. R.* 4:8-6 (formerly *Rule* 3:8-6):

"All pleadings shall be so construed as to do substantial justice."

*R. R.* 4:15-2 (formerly *Rule* 3:15-2):

"When issues not raised by the pleadings and pretrial order are tried by consent or without the objection of the parties, they shall be treated in all respects as if they had been raised in the pleadings and pretrial order. * * *"

We fail to see how the pleadings or the pretrial order exclude this evidence. It is apparent that both counsel considered it as within the pleaded issues. Knowledge of possible defects in the hooks certainly was relevant on the issue of defendant's negligence in failing to test and inspect.

Although these conclusions dispose of the appeal, for the guidance of the court below on the retrial we will pass

on the objections raised by the defendant to the rejected offer of testimony by the plaintiff's expert, Smith, as to the "customs and standards used by those trades or occupations wherein the suspension of a human being at elevations with regard to the type of equipment, particularly hooks." Such evidence was relevant to the issue at hand and the trial court erred in excluding it; see *Deschamps v. L. Bamberger & Co.*, 128 *N. J. L.* 527 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 517 (*E. & A.* 1942); 2 *Wigmore on Evidence* (*3rd ed.* 1940), *sec.* 461.

The judgment below is reversed and the matter is remanded for a new trial.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice OLIPHANT—1.