IRA L. PANGBORN, AS GENERAL ADMINISTRATOR AND AS ADMINISTRATOR *AD PROSEQUENDUM* OF THE ESTATE OF WILLIAM IRA PANGBORN, DECEASED, AND WILBUR FORNER, AN INFANT, BY HIS GUARDIAN *AD LITEM*, ANNA FORNER GIARRETTA, AND ANNA FORNER GIARRETTA, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, v. THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued February 14, 1955—Decided March 21, 1955.

88

*Mr. Stanley W. Greenfield* argued the cause for appellant Pangborn and respondent Forner (*Mr. Francis A. Gordon,* attorney; *Mr. Greenfield* of counsel).

*Mr. Huyler E. Romond* argued the cause for Central Railroad Company of New Jersey as respondent and as appellant (*Messrs. Toolan, Haney & Romond,* attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. Three high school boys, walking to their homes from school along their usual route which would take them across defendant's tracks at the Washington Avenue crossing at the east end of defendant's Dunellen passenger station, passed between the westbound station and a newsstand and thence walked 123 feet down

the platform, a pavement at grade 10 to 12½ feet wide, to the crossing, where they stopped and waited within the boundaries of the sidewalk because a long, fast and noisy westbound freight was passing through on Track 2. The crossing gates were down and the boys stood in the seven-foot space between the gate lowered across the sidewalk and the near rail of Track 6. That track and Tracks 4 and 2, in that order from the platform, are on the westbound side of the station and are separated from the three tracks fronting on the eastbound station by an iron picket fence in the middle of the right-of-way. The boys stood abreast, facing east in the direction from which the fast freight was coming on Track 2, the westbound track next to the picket fence. William Pangborn, aged 17, was the closest to and within two or two and one-half feet of the near rail of Track 6. Wilbur Forner, aged 15, was to Pangborn's left, about four feet from the rail. Robert Reuter, aged 16, was to Forner's left, near the lowered crossing gate and about six feet from the rail. The boys were standing in that way about ten seconds before the mishap which gave rise to this action occurred.

Unknown to the boys and not heard by them, a drill engine proceeding at not more than five miles an hour was pushing two freight cars along Track 6 from a freight house 417 feet behind the boys to the freight yard beyond the Washington Avenue crossing. The lead car overhung the near rail of Track 6 an estimated two feet and five inches. The over-hang struck the unsuspecting Pangborn boy in the back and crushed him to death under the forward truck of the car which was derailed and came to a stop about 66 feet beyond. The Forner boy was thrown away from Track 6 and toward the lowered gate, suffering a severe head injury which has left him without any memory whatever of the events of that day. Reuter escaped uninjured. He was unable to say, however, whether the freight car also hit Forner or whether he was propelled when struck by Pangborn's flying body. The conductor on the lead freight car, who was standing on a ladder on the far side of the car within a foot or two

of the front of the car, testified that it appeared to him that the car "knocked the one boy up agin the other one."

The complaint joins actions for Pangborn's death and Forner's injuries. Verdicts for the plaintiffs in both actions were returned by a Middlesex County jury. The Appellate Division reversed the Pangborn judgment by a divided vote, but unanimously affirmed as to Forner. 32 *N. J. Super.* 289 (1954).

The Pangborn appeal is here as of right under *R. R.* 1:2–1(*b*) by reason of the dissent in the Appellate Division. The railroad attempts to bring the Forner case here by cross-appeal. But the two actions are separate and distinct, and the fact that they were brought under one complaint and tried together does not mean that a dissent in the one case gives the defendant an appeal as of right in the other. *R. R.* 1:2–6 governing cross-appeals allows such an appeal only from a judgment properly here at the instance of an appellant therefrom. *Frank v. Frank,* 7 *N. J.* 225, 235 (1951). The railroad asserts no ground under *R. R.* 1:2 permitting an appeal of right from a judgment unanimously reached in the Appellate Division, and if such a ground were present the procedure would be by direct appeal from the judgment as to Forner, not by cross-appeal from the Pangborn judgment. The Forner case could not be brought here except by certification allowed under *R. R.* 1:10. However, the Forner plaintiffs have not objected and both cases raise substantially the same issues. We have therefore decided to treat the cross-appeal as a petition for certification and to grant certification.

The first question is whether the boys are to be deemed guilty of contributory negligence as a matter of law so that the railroad was entitled to judgments of dismissal on its motions made both at the close of plaintiffs' proofs and at the end of the case. The majority of the Appellate Division were of the view that the motions were well taken in the Pangborn case, but all three judges concurred that the matter of Forner's contributory negligence was for the jury. The judges in the majority distinguished the situations of

the two boys on the ground that Pangborn's contributory negligence was established from the fact that he was standing where he could be struck by the ordinary overhang of a properly constructed freight car, whereas the jury could find upon the evidence that Forner was outside the overhang limits, in which case it was for the jury to say whether Forner was at fault in standing where he might be hit by the body of the Pangborn boy.

We agree with the view of Judge Jayne, who dissented, that in the circumstances shown by this record the contributory negligence of both boys was a jury question. The boys were on the side of the station where ordinarily westbound trains rather than eastbound trains might be expected. This station is on the "main line," it "is a very busy crossing" and "many trains" are there. But Track 6 is not a main line through-track with trains running along it at regular intervals; it is merely an "unassigned direction" track terminating about a thousand feet back from where the boys stood. The witnesses for both sides agreed that such few westbound passenger trains as had their terminus at Dunellen would back out of the station to the yards after discharging their passengers. But the train here was not such a train and only the railroad's witnesses testified that Track 6 was also used at times each day when freight cars were shunted back and forth between the freight house and the freight yard. This was not the testimony of plaintiffs' witness, a police officer whose daytime beat for 17 years brought him in the vicinity of the crossing. He said he knew that Track 6 was "used for locals to come into Dunellen station and they back up and go back into the yard," but he made no mention of freight trains. Reuter's evidence was to like effect and, indeed, when asked why neither he nor his companions looked back of them as they walked on the platform toward the crossing and while they stood waiting for the passage of the fast freight on Track 2, he answered, "We wouldn't expect a train from the west."

But, conceding the fact to be that Track 6 was frequently, if irregularly, used to shunt freight cars, and assuming also

that a traveler should ordinarily be charged with knowledge that a railroad can and may run trains in either direction on a track, yet on the proofs here the jury could find that these boys honestly, if mistakenly, believed that no trains moved east on Track 6 except passenger locals backing out of the station, so that the danger from a drill engine moving cars east from the freight house was not obvious and apparent to them. The boys were in the habit on the way from school of taking the shortcut through the westbound station along the platform to the crossing. Thus, from the considerations that these boys were teen-agers, held to a standard of care and caution exercised by others of similar age, judgment, experience and environment, and that they stood on the side of the station where trains regularly came from the east, in which direction they were looking as the fast westbound freight on Track 2 came from that quarter and passed behind them, and that they "wouldn't expect a train from the west," it is clear that reasonable minds might disagree as to the inferences derivable from their conduct, and in such case the jury and not the court must determine their fault. We have only recently reiterated the rule that "only in the clearest case of contributory fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for decisive action by the court. Care is to be taken that the reasonable man be not endowed with attributes which properly belong to a person of exceptional perspicuity and foresight." *Battaglia v. Norton*, 16 *N. J.* 171, 179 (1954).

■■ There is no hard and fast rule that, regardless of circumstances, a person is conclusively to be held to be guilty of contributory negligence if he stands on a station platform or on a public way so close to a railroad track as to be struck by the ordinary overhang of a properly constructed train. The test is whether there was something inherently or obviously dangerous in the situation, and it cannot be said on the proofs in this record that the danger was so inherent and obvious to the boys as to allow decisive action by the court and preclude a jury determination of their fault. The

former Court of Errors and Appeals in *Munroe v. Pennsylvania R. Co.*, 85 *N. J. L.* 688 (1914), laid down the principles which govern here. There the deceased was standing on the platform within three feet of the edge, waiting for his train, when a train an hour late rushed through the station without warning and caught the deceased in its suction and threw him to the platform causing the injuries which resulted in his death. The former high court held that the circumstances in which the deceased found himself upon the platform at the time of the accident could not be characterized by the court as negligent as a matter of law but presented a jury question, saying (85 *N. J. L.*, at *pages* 691–692) :

"We think it cannot be said as a matter of law that it was *ipso facto* negligent for the deceased to walk within three feet of the edge of the platform, unless there was something inherently or obviously dangerous in that situation, and which to the ordinary prudent man must beyond peradventure have so appeared. The negligence of such an act it must be apparent is entirely relative. Under certain circumstances and situations it might be clearly foolhardy and extremely negligent, but whether it is so in any given case, where the danger is neither obvious nor apparently existent, presents a question of fact into which must enter, for the consideration of the jury, all the details and minutiae of the environment which throw light upon the situation, and the conduct of the deceased. The question of contributory negligence is thus placed in the realm of uncertainty and doubt, and, when it assumes that complexion, and presents the form of a debatable question, the authorities are uniform that to the jury is committed the solution of the inquiry."

The situation here, like that in the *Munroe* case, has no similarity to the situations in *Dotson v. Erie R. Co.*, 68 *N. J. L.* 679 (*E. & A.* 1903) ; *Higgins v. Erie R. Co.*, 89 *N. J. L.* 629 (*E. & A.* 1916), and *Long v. Delaware, L. & W. R. Co.*, 127 *N. J. L.* 207 (*E. & A.* 1941), relied upon by the Appellate Division majority. In the *Dotson* case the plaintiff, an adult lady, was walking along a station platform when she diverged in her course toward the track upon which the very train she was about to take was entering the station at the rate of three or four miles an hour and she was struck by its bumper. In the *Higgins* case an express company employee was pulling an empty truck along a platform to meet

an incoming train and drew the truck so near the edge of the platform that it was struck by part of an engine which overlapped the platform. In the *Long* case a passenger waiting for his train at a busy suburban station was admittedly reading his newspaper standing between six and eight inches from the edge of the platform when a non-stop express train came through and he was struck by a handrail which projected not over three inches from the corner of one of the cars. In all three cases reasonable men could not disagree that the plaintiffs' conduct was "clearly foolhardy and extremely negligent" and the determinations against the plaintiffs without the intervention of the jury were fully justified.

The railroad insists, however, that a conclusion of the boys' contributory negligence as a matter of law is required by the admitted facts that the boys made no observation back of them as they walked along the platform to the crossing or as they stood in the crossing inside the lowered crossing gate for the ten seconds which elapsed before the mishap. The point is also made that the trial judge erred in refusing to charge the railroad's requests to charge numbered 11 and 12 as follows:

"(11) The undisputed testimony is that these infant plaintiffs were standing near the North rail of the West bound track, with their backs to the West and that they did not look for trains coming from the West while standing there. I charge you that the testimony is to the effect that they could have seen up the tracks, to the West, a great distance and seen a train approaching. Had these boys looked to the West and made a careful observation they could have seen this train approaching and avoided injury.

(12) If a traveler on the highway could have seen an approaching train in time to escape, it would be presumed, in case of collision, that he did not look, or looking, failed to heed what he saw."

But, however compelling the duty to make an observation "each way before crossing" a railroad track (and the plaintiffs were trying to cross the tracks in the cases relied upon by the railroad, *Pennsylvania R. Co. v. Righter*, 42 *N. J. L.* 180 (*E. & A.* 1880), and *Siegler Co. v. Norton*, 8 *N. J.* 374 (1952)), these boys were not attempting to cross. As they should have done, they were awaiting the passing of the fast

westbound freight, and, the jury might reasonably infer, the raising of the crossing gates, before attempting to cross. They were thus precautious of the obvious danger which they saw and could appreciate, but it was for the jury to say whether the boys, under these particular circumstances with the increased hazard, hereinafter referred to, that the whistle or bell if sounded by the drill engine was inaudible because of the noise of the westbound freight, were at fault in not also looking for danger from behind them, which danger, so far as this record shows, was, to them, neither obvious nor apparently existent, and which, indeed, the jury on the evidence might reasonably conclude they had no reason to anticipate. The drill engine had picked up the two freight cars from a side track back of the freight house and had spotted them on Track 6 in front of the freight house before starting to push them to the freight yard. A statement of Reuter's in evidence and taken the day after the accident says that he "noticed the engine on the freight house siding" as the boys walked from the high school toward a park leading to the station; but there is no evidence of where the engine or cars were when the boys came upon the station platform. At five miles per hour the train must have traveled the 417 feet to the crossing in less than a minute, which raises a question, for the jury's resolution surely, whether the train was made up on the track and started on its way to the crossing before or after the boys came on the platform and started down the platform to the crossing, walking "slowly," according to Reuter.

The railroad next argues that in standing inside the lowered crossing gate, although within the boundaries of the public highway, the boys had the status of licensees merely, to whom the railroad owed no duty except to refrain from acts willfully injurious. The point has no merit. The railroad does not refer us to any authority, either statute or decision, which determines the status of the traveler on the public highway and makes different the duty of the railroad toward him, dependent upon whether he is on the highway inside or outside the crossing gates. On the contrary, our

decisions plainly imply that no such distinction is recognized. Although the function of crossing gates "is to prevent persons going by—that is, past the gates when down and getting onto the tracks in a situation of danger," *James v. Delaware, L. & W. R. Co.*, 92 *N. J. L.* 149, 157 (*E. & A.* 1918), one who ignores the warning thereby conveyed and attempts to cross by going under them may nevertheless recover for damages suffered from the railroad's mere negligence if not barred from recovery by his own contributory negligence. *Samkiwicz v. Atlantic City R. Co.*, 82 *N. J. L.* 478 (*E. & A.* 1911). The fact that the gates were lowered does not change the status of the traveler attempting to cross or the railroad's duty of ordinary care; that fact, properly considered by the arbiter of the traveler's conduct, judge or jury, as the case may be, is merely "a circumstance to be taken into account in determining whether, under all the facts, he was negligent in not observing the warning thereby conveyed," *Ibid*, 82 *N. J. L.*, at *page* 482. And the decision in the *James* case does not support defendant, as it contends. That case held only that the provisions of the Crossing Acts in effect at the time of the mishap there considered (which acts are no longer operative, see *Siegler Co. v. Norton, supra*) requiring the submission of issues of contributory negligence to the jury in certain cases, could not be invoked by a plaintiff injured while crossing the tracks who got onto the crossing, not over the highway past the gates, "but by getting onto the crossing inside of the company's right of way by coming down alongside the tracks." (92 *N. J. L.*, at page 154).

The railroad does not deny that the crossing gates were lowered in the first instance because of the passing through of the fast westbound freight. It is also clear that the boys stood where they did without attempting to cross the tracks, in observance of the warning, conveyed by the lowered gates, of the train which they saw. Whether the lowered gate was also a warning of the presence of the train coming up behind them is at best, on this record, one of "the details and minutiae of the environment, which throw light upon the situation" and whether as to that train the boys'

conduct was negligent was for the jury's determination. *Munroe v. Pennsylvania R. Co., supra,* 85 *N. J. L.,* at *page* 692. To the extent that the safeguard was purposed to keep the boys from going on and over the crossing, it was effective; whether it should also have served to warn them away from the place they were standing to avoid being hit by the freight car being pushed toward them from back of them was, on the proofs, plainly a question "where different minds may reasonably come to different conclusions." *Battaglia v. Norton, supra.*

The last argument is that no negligence of the railroad was proved. The railroad's brief concedes that it was its duty to give an *"audible* signal by either bell or whistle" (emphasis supplied) as the drill engine pushed the two cars toward the Washington Avenue crossing (*N. J. S. A.* 48:12–57). It is insisted, however, that the railroad's compliance with the statutory duty is conclusively established by the testimony of the five crew members that the automatic bell on the engine sounded throughout the trip and that the whistle was being blown until the engineer stopped blowing it to give his attention to the emergency stop signal he received from the conductor just before the Pangborn boy was hit. But the testimony of the crew was disputed by Reuter in a manner which under our decisions presented a jury question whether or not either whistle or bell signal was given. *Mellon v. Pennsylvania-Reading Seashore Lines,* 7 *N. J.* 415 (1951); *Gibson v. Pennsylvania R. Co.,* 14 *N. J. Super.* 425 (*App. Div.* 1951); *Ackerley v. Pennsylvania R. Co.,* 130 *N. J. L.* 292 (*E. & A.* 1943); *James v. Delaware, L. & W. R. Co., supra.*

Moreover, the railroad's brief acknowledges that the boys "probably could not have heard the bell. We do not feel it necessary to do more than state the fact that a freight train of one hundred cars or more [a reference to the fast westbound freight going through on Track 2] would make considerable noise * * *." This acknowledgment demonstrates what the evidence shows, namely, that the railroad by

its own conduct created a situation which imposed upon it the burden of greater safeguards for the protection of the boys. Ordinarily the statutory prescription is the measure of the railroad's duty to a traveler at a crossing on the public highway and no other duty is owed the traveler. *New York, L. E. & W. R. Co. v. Leaman,* 54 *N. J. L.* 202 (*E. & A.* 1891). There are circumstances, however, in which the railroad creates for itself the duty to take more than the statutory precautions when a train approaches a crossing. This is the case when the railroad is responsible for an obstruction to vision or to hearing at the crossing; "when the company has created extra danger, it is bound to use extra precaution." *Pennsylvania R. Co. v. Matthews,* 36 *N. J. L.* 531, 535 (*E. & A.* 1873); *Horandt v. Central R. Co.,* 78 *N. J. L.* 190 (*Sup. Ct.* 1909); *Kyle v. Lehigh Valley R. Co.,* 81 *N. J. L.* 186 (*Sup. Ct.* 1911); *Girardin v. New York & Long Branch R. Co.,* 9 *N. J. Super.* 275 (*App. Div.* 1950); *Di Giendemonica v. Pennsylvania-Reading Seashore Lines,* 123 *N. J. L.* 296 (*E. & A.* 1939).

The crew of the drill engine and freight cars frankly admitted that they were aware of the noisy fast freight passing through on Track 2 as they proceeded from the freight house to the crossing, and two of them testified that they were on the lookout ahead of them. But, while the fireman in the engine cab on the boys' side of the track, and the conductor on the ladder on the lead car, testified that, from the freight station the vision was clear and unobstructed even beyond the crossing to the freight yard, and the fireman said he was "looking ahead continuously" "until the accident happened," and the conductor said he was "watching out the front of us," yet the fireman's testimony was that he saw but one boy, and him only as "his arms and legs were going under the truck," and the conductor said he first saw the three boys standing abreast with their backs to him when the lead car was "around ten or fifteen or twenty foot from them." The conductor "yelled at them to attract their attention to step back" but "they never moved" and when he realized "they were too close to the track" he gave the engineer an emergency

stop signal, "a wash out," when "around ten foot" from the boys.

 The air brakes in the freight cars were not coupled to the engine, but the engineer testified that the train could be stopped in from "twenty-five to thirty feet," only "five feet less" than if they had been coupled. It thus appears that had the "wash out" signal been given but four or five seconds sooner, the train might have been brought to a stop before the lead car reached the boys. The verdicts reasonably imply that the jury found that the boys were on the crossing in plain view of the conductor and fireman for about ten seconds, or long enough to permit a timely signal, except for negligence on their part in keeping a proper lookout. In the circumstances a question of negligence for the jury's determination was presented on the railroad's own evidence.

And the additional duty of keeping a lookout raised in these special circumstances raises also an important question as to the proximate cause of this mishap. The trial court's charge to the jury phrased this requisite of defendant's liability according to the fashion of such charges followed generally by our judges in the trial of negligence actions. In effect the charge was that recovery was to be denied the plaintiffs despite negligence on the part of the railroad if the boys were themselves guilty of negligence which in any wise contributed to the accident. The converse of that proposition is, of course, that if the railroad's negligence was the sole cause of the accident and the boys' negligence was merely a condition of its occurrence and in no way a contributing cause, the plaintiffs are entitled to a recovery. *Menger v. Laur*, 55 *N. J. L.* 205 (*Sup. Ct.* 1893). In that sense the so-called doctrine of last clear chance as a mere application of the principle of proximate cause has not been repudiated in this State. The statement in *Brennan v. Public Service R. Co.*, 106 *N. J. L.* 464, 466 (*E. & A.* 1930), that the "doctrine has never been adopted in this state and, in fact, has been repudiated" has reference to the view held in some jurisdictions, which view rejects the proximate cause basis of the so-called doctrine and regards the doctrine as a true excep-

tion to, rather than a logical qualification of, the doctrine of contributory negligence, so that where this view is followed recovery is permitted in spite of the contributing negligence of the injured party. *Note, 92 A. L. R. 47, 53 (1934).*

██ The best considered decisions properly catalogue the alleged last clear chance doctrine as simply an application of the principle of proximate cause. It was said in *Nehring v. Connecticut Co., 86 Conn. 109, 84 A. 301, 45 L. R. A., N. S., 896, 898–899 (Sup. Ct. Err.* 1912):

"The notion appears to be more or less prevalent that this so-called doctrine is a discovery of recent years, that it embodies a new legal principle, and that this principle is one which invades the domain formerly assigned to contributory negligence, and sets limitations upon the operation of this latter doctrine, so long and so deeply embedded in English and American jurisprudence. This is by no means true as respects either the age or the character and scope of the principle which it embodies. The names by which it has come to be known are indeed of recent origin, and perhaps its present vogue, and the misconception which prevails as to its true place in the law of negligence, are due in part to its thus being given an independent status in the terminology of the law * * *. The question with respect to negligent conduct on the part of the person injured through the negligence of another as affecting the former's right to recover thus becomes resolved in every case into one as to whether or not that conduct of his was a proximate cause of the injury. If it was, then the contributory negligence rule is applicable, and the plaintiff will by its operation be barred from recovery. If it was not, that rule has no pertinence to the situation, since there was no concurrence of negligence without which there can be no contributory negligence, in the legal sense. It is conduct of the latter kind—that is, conduct careless in itself, but not connected with the injury as a proximate cause of it—to which the so-called doctrine of 'the last clear chance' relates, and that doctrine embraces within its purview such conduct only. This being so, it may well be questioned whether the doctrine deserves a classification and a name as of an independent principle. But if for convenience sake or other reason it is to be dignified in that way, it is apparent that there is no manner of inconsistency between it and the contributory negligence rule, and that the domain of the latter rule is in no way invaded or narrowed by a full recognition of it. It follows that the decisive question, in each case where a plaintiff injured is found to have been at fault in the premises from his failure to exercise the required degree of care, resolves itself into one as to whether that fault was or was not a proximate cause of the injury, and that the answer to that question will infallibly determine whether or not it will bar a recovery."

These are in substance the conclusions reached in the opinion of Chief Justice Depue in *Menger v. Laur, supra,* where he analyzed *Davies v. Mann,* 10 *M. & W.* 546, 152 *Eng. Rep.* 588 (*Exch.* 1842), and *Radley v. L. N. & W. Ry. Co.,* 1 *App. Cas.* 754 (*H. L.* 1876), the sources of the so-called doctrine, and concluded:

"In the trial of cases of this kind, where it appears that both parties were in fault, the primary consideration is whether the faulty act of the plaintiff was so remote from the injury as not to be regarded, in a legal sense, as a cause of the accident, or whether the injury was proximately due to the plaintiff's negligence, as well as to the negligence of the defendant. If the faulty act of the plaintiff simply presents the condition under which the injury was received, and was not in a legal sense a contributory cause thereof, then the sole question will be whether, under the circumstances and in the situation in which the injury was received, it was due to the defendant's negligence. But if the plaintiff's negligence proximately—that is, directly—contributed to the injury, it will disentitle him to a recovery, unless the defendant's wrongful act was willful, or amounted to an intentional wrong. A court of law cannot undertake to apportion the damages arising from an injury caused by the co-operating negligence of both parties, or to determine the comparative degree of the negligence of each." (55 *N. J. L.,* at *page* 216)

And see Dean, now Judge, Clark's analysis of the New Jersey cases in *Sutton v. Public Service Interstate Transp. Co.,* 157 *F. 2d* 947 (*2d Cir.* 1946), *certiorari* denied 330 *U. S.* 828, 67 *S. Ct.* 870, 91 *L. Ed.* 1277; also *Annotation,* 171 *A. L. R.* 365 (1947).

It is basic law that questions of contributory fault do not arise without proof first of the existence and breach of a duty on defendant's part. That essential proof is found here in the evidence, apparently believed by the jury, either that the statutory whistle or bell signal was not given or that if given was inaudible to the boys because of the noise created by defendant's own fast freight, in which latter case there was raised the added duty in the train crew to keep a proper lookout for travelers on the public highway at the crossing. And in such later case also the jury could find under the court's charge as to proximate cause that, if the boys carelessly placed themselves in a position exposed to danger and the

position was discoverable by a proper lookout on the part of defendant's train crew in time to have avoided the mishap, and the crew failed to use reasonable care in making a lookout, the failure was the sole cause of the resulting death of Pangborn and the injury to Forner. See *Morris, Torts* (1953), *pp.* 219–226. It is pertinent to observe that the phrasing of instructions to the jury in the language of proximate cause is preferable to the use of the label "last clear chance" because such language accurately defines the applicable principles, while reference to "last clear chance" may be confusing.

The Appellate Division's judgment in the Forner action is affirmed. Its judgment in the Pangborn action is reversed and the judgment entered in the trial court is reinstated.

*For reversal as to plaintiff Pangborn*—Justices HEHER, WACHENFELD, JACOBS and BRENNAN—4.

*For affirmance as to plaintiff Pangborn*—Chief Justice VANDERBILT, and Justices OLIPHANT and BURLING—3.

*For affirmance as to plaintiff Forner*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal as to plaintiff Forner*—None.