255 F.2d 854
 Cecelia WATN, Administratrix and Administratrix Ad Prosequendum of the Estate of John Martin Watn, Deceased,
v.
The PENNSYLVANIA RAILROAD COMPANY and Pennsylvania-Reading Seashore Lines, Appellant.
Cecelia WATN, Administratrix and Administratrix Ad Prosequendum of the Estate of John Martin Watn, Deceased,
v.
The PENNSYLVANIA RAILROAD COMPANY, Appellant, and
Pennsylvania-Reading Seashore Lines.
 No. 12351.
 No. 12352.
 United States Court of Appeals Third Circuit.
 Argued February 18, 1958.
 Decided June 13, 1958.
 
 John R. McConnell, Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for Pennsylvania-Reading Seashore Lines.
 Theodore Voorhees, Philadelphia, Pa. (Matthew J. Broderick, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for Pennsylvania R. Co.
 B. Nathaniel Richter, Philadelphia, Pa. (Kenneth Syken, Charles A. Lord, Richter, Lord & Levy, Philadelphia, Pa., on the brief), for appellee.
 Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 This action was brought by the administratrix of the estate of John Watn who was killed when the engine of a Pennsylvania-Reading Seashores Lines (Seashore) train struck him while he was in the employ of the Pennsylvania Railroad Company (Pennsylvania) as a fireman. The accident occurred in New Jersey. Recovery is sought against both Pennsylvania and Seashore. The cause of action against Pennsylvania is based on the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The cause of action against Seashore is based on diversity of citizenship, and the plaintiff seeks to enforce rights under the New Jersey Wrongful Death and Survival Statutes. N.J.S.A. 2A:31-1 et seq. The federal act and the law of New Jersey are respectively applicable.
 
 
 2
 The cause was tried by a jury. Seashore moved for a directed verdict asserting that Watn was guilty of contributory negligence as a matter of law. The trial court denied this motion, and thereafter the jury returned a verdict in favor of the plaintiff against both defendants in the amount of $63,000. After judgment both defendants moved for a new trial. The district court denied both motions.
 
 
 3
 On these appeals both defendants urge that they are entitled to new trials. Pennsylvania bases its motion on the theory that the verdict as to it was contrary to the weight of the evidence; that to its grave prejudice counsel for the plaintiff showed the jury a plan of the yard which had not been introduced into evidence; and that the charge of the trial judge was inadequate in that it failed to explain to the jury the difference between liability under the Federal Employers' Liability Act and liability under the New Jersey Wrongful Death and Survival Statutes. Seashore seeks a new trial only on the basis of the trial court's alleged erroneous charge. Seashore, however, seeks a new trial only as an alternative for it continues to contend that the overwhelming weight of the uncontradicted evidence establishes Watn's contributory negligence and that therefore it was entitled to a directed judgment as a matter of law.
 
 
 4
 We cannot agree that Seashore is entitled to judgment in its favor as a matter of law. It is established by the applicable New Jersey decisions that contributory negligence ceases to be a question of fact for the jury and becomes an issue of law for the court only in those cases where the "contrary hypothesis is not fairly admissible." Pangborn v. Central Railroad Co. of New Jersey, 1955, 18 N.J. 84, 93, 112 A.2d 705, 709.[1] Where a determination of contributory negligence depends upon the conclusion to be reached from a variety of circumstances considered in relation one to the other, the question of contributory negligence remains one of fact for the jury. Mellon v. Pennsylvania-Reading Seashore Lines, 1951, 7 N.J. 415, 81 A.2d 747; Piacente v. New York Central R. Co., 1944, 131 N.J.L. 481, 36 A.2d 921.
 
 
 5
 Watn, a Pennsylvania fireman, immediately prior to the accident was riding on the rear portion of the left side steps of a Pennsylvania diesel locomotive which was backing slowly into the Camden Yard of Pennsylvania. Watn was riding on the left side of the diesel in relation to the front of the engine but was on the right side of the engine in relation to the direction in which it was proceeding. The Seashore train, en route from Wildwood to Camden, New Jersey, was proceeding to the Camden Yard on track No. 2. Moving at the rate of 8 to 10 miles an hour the Seashore train crossed-over to track No. 3, and eventually to track No. 4, the latter track being the one immediately alongside that on which the Pennsylvania diesel was moving.
 
 
 6
 When the Seashore train was at a distance of approximately a city block from the Pennsylvania diesel the fireman of the Seashore train observed Watn standing on the steps of the Pennsylvania diesel. He continued to observe Watn in that position but failed to notify his engineer of this fact. The engineer testified that a beam in the Seashore engine cab prevented him from seeing Watn until the Seashore train's engine was even with the front end of the Pennsylvania diesel, i. e., the other end of the engine from the steps on which Watn was standing. There is, however, evidence in the record that the Seashore engineer could have seen Watn at a distance of not less than 200 feet, had he been looking toward him. The Seashore Engineer testified, however, that instead of looking toward Watn he was looking beyond the point where Watn was to a yard flagman who was signalling him that the Seashore train had the right to enter the yard. There was testimony to the effect that the Seashore train could have been halted within 100 feet had this been attempted.
 
 
 7
 It seems clear from the evidence that the Seashore train did not blow its whistle until the forward part of the train, a Budd five-car train, with the engine and the engineer in the fore part of the leading car, was even with that portion of the Pennsylvania diesel farthest from the point where Watn was standing. There was evidence that this blast was not intended to warn Watn but rather as a signal to the flagman. So much is reasonably clear from the evidence. But immediately thereafter Watn was struck by the Seashore train and was fatally injured. No one saw Watn descend from the steps. His body was found on the tracks. It is reasonable to suppose if he had remained on the steps he would not have been injured.
 
 
 8
 The accident occurred in the Camden Yard between Second and Third Streets. A crucial question of fact arises as to whether the Seashore train came on to track No. 4 between Third and Second Streets or between Fourth and Third Streets. If the former was the case it follows that the Seashore train suddenly crossed-over to track No. 4 at a point where it was very close to the Pennsylvania diesel. Under the law of New Jersey there is a presumption of due care upon the part of a deceased in a negligence case. McConachy v. Skalerew, 1934, 113 N.J.L. 17; 171 A. 817; Danskin v. Pennsylvania R. Co., 1910, 79 N.J.L. 526, 76 A. 975. From the facts at bar the jury could have inferred that before descending from the diesel Watn looked up track No. 4 to see if it was safe for him to descend, and that having observed the Seashore train on track No. 3 and no train on track No. 4, he stepped down with no reason to anticipate a sudden cross-over by the Seashore train to track No. 4. If this was so the jury would have been entitled to infer that Watn was not guilty of contributory negligence. He was not required to go on looking down track No. 4 but was entitled to go on about his railroad business. If, on the other hand, the Seashore train was on track No. 4 for some considerable length of time and did not make a sudden cross-over from track No. 3 to track No. 4, the presumption of due care would have been rebutted and Watn could have been found guilty of contributory negligence. A pivotal issue of fact was therefore presented. Since the jury, with rational bases, could have found either way, it is clear that the issue of contributory negligence in this case was a question of fact for the jury and not an issue for the court. The court below did not err in sending this question to the jury.
 
 
 9
 The reliance placed by Seashore on the decision of the Supreme Court of New Jersey in Siegler Co. v. Norton, 1952, 8 N.J. 374, 86 A.2d 8 is misplaced. That case dealt with a railroad crossing situation in which the railroad's right of passage as against the right of the crossing traveller to enter a track area placed an extremely heavy duty of care on the traveller and allowed the engineer to make the reasonable assumption that the traveller would use the crossing with due regard to the railroad's right of way. Rafferty v. Erie R. Co., 1901, 66 N.J.L. 444, 49 A. 456. The situation presented is distant from the facts of the case at bar which involves the death of a railroad fireman lawfully working on railroad premises and whose presence should be anticipated by train engineers. See Pangborn v. Central Railroad Co. of New Jersey, supra. Seashore clearly is not entitled to judgment in its favor as a matter of law.
 
 
 10
 We come next to the issues presented by the requests for new trials. The first contention raised by Pennsylvania is that the verdict as to it was against the weight of the evidence. There is undisputed evidence in the record that Pennsylvania allowed large clinkers to lie in the spaces between tracks 4 and 5, and that several of the ties were a foot or so longer than other ties, this being caused by the failure of Pennsylvania to remove or trim the longer ties which had formerly carried a third rail which had been removed some years before the accident. There also was testimony to the effect that the space between the tracks at the point of the accident was four or five inches narrower than that between the neighboring tracks at that location. All of these factors created a hazardous place to work. While apparently conceding that it allowed these conditions to persist, Pennsylvania argues that there is no evidence from which the jury could infer that these conditions caused or contributed to the accident.
 
 
 11
 We cannot agree. Under the principles of causation and liability laid down by the Supreme Court of the United States in F.E.L.A. cases we conclude that the jury was entitled to infer that Watn descended from Pennsylvania's diesel engine to the No. 4 track and at that moment, finding himself in a position of peril due to a sudden cross-over to that track by the Seashore train, then tried to re-board the Pennsylvania diesel or took some other action in an attempt to avoid injury, and that because of the condition of the track and roadbed referred to either slipped on the clinkers or stumbled on the irregular ties or was unable to avoid being hit by the Seashore train because of the unusually narrow clearance. Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523,76 S.Ct. 608, 100 L.Ed. 668; Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 744, 90 L.Ed. 916.
 
 
 12
 The jury, having found against both defendants, the plaintiff is entitled to every reasonable inference in her favor which may be drawn from the evidence. We are faced here with a disputed issue of fact which we are not free to redetermine in this court. That the jury's verdict necessarily involved some degree of speculation and conjecture is no basis for a new trial. As was stated in Lavender v. Kurn, supra, 327 U.S. at page 653, 66 S.Ct. at page 744, "[A] measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." See also McBride v. Toledo Terminal R. Co., 1957, 354 U.S. 517, 77 S.Ct. 1398, 1 L.Ed.2d 1534; Gibson v. Thompson, 1957, 355 U.S. 18, 78 S.Ct. 2, 2 L.Ed.2d 1; Stinson v. Atlantic Coast Line Railroad Co., 1957, 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93; Shaw v. Atlantic Coast Line Railroad Co., 1957, 353 U.S. 920, 77 S.Ct. 680, 1 L.Ed.2d 718; Rogers v. Missouri Pacific Railroad Co., supra; Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520.
 
 
 13
 Pennsylvania's second major argument for a new trial is based on the exhibition by plaintiff's counsel of a plan of the Camden yard which he had drawn on the back of a hotel doily during the noon recess just before argument to the jury. It had not been identified or offered in evidence. It was not shown to the court or to counsel for the defendants prior to its exhibition to the jury. Such trial tactics are not to be countenanced. No paper or document should be exhibited to a jury which is not in evidence.[2] But a new trial is not required in this particular instance for after this unfortunate happening the trial judge immediately before his charge inquired of the jury whether any of its members had considered the drawing as evidence or had given it weight up to that time. The jurors replied in the negative.[3] The trial judge then said to the jury that "[I]t [the jury] couldn't possibly give it [the doily drawing] any consideration at all." Pennsylvania argues that this admonition could not have cured the effect which the exhibition of the doily had on the jury. In view of the fact that the record is clear that it had no effect upon the jury, we feel the admonition of the court was adequate to cure counsel's egregious error.
 
 
 14
 Both Pennsylvania and Seashore contend that serious errors in the charge require the granting of a new trial. We have studied the charge and are not persuaded that the contentions of the railroads are supportable. We conclude that the trial judge explained adequately the two different theories of liability in the case. The law relating to the standard of care and the law of contributory negligence were presented appropriately to the jury. Nor can we agree with the contention of Seashore that the trial judge, after charging on contributory negligence, instructed the jury that its members could accept or reject the applicable rules of law as stated by the court. Nowhere in the charge do we find such a direction. Actually, the trial judge told the jury that they were to apply the law to the facts of this particular case.
 
 
 15
 The judgment of the court below will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Mr. Justice Brennan, then an Associate Justice of the Supreme Court of New Jersey, stated in the cited case: "We have only recently reiterated the rule that `only in the clearest case of contributory fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for decisive action by the court. Care is to be taken that the reasonable man be not endowed with attributes which properly belong to a person of exceptional perspicuity and foresight.'", citing Battaglia v. Norton, 1954, 16 N.J. 171, 179, 108 A.2d 1, 5
 
 
 [2]
 The counsel committing this solecism was not an inexperienced member of the bar. On the contrary he is a trial lawyer of long experience. In this instance he may have been forgetful of what the rules of evidence and courtroom decorum required. We give him the benefit of that doubt
 
 
 [3]
 The colloquy was as follows:
 The Court: "Members of the jury: Before I start my charge there is a little matter I want to take up with you which was raised by counsel after the arguments were all in yesterday, and I want you to answer me how you feel about it.
 "It is a rule of law, members of the jury, in the trial in these cases here that if any document is to be given to the jury for their consideration it first has to be identified and then qualified as being admissible, the judge rules on it; and then, as you saw happen in this case here, various documents were brought in, photographs, and so forth; that is the procedure which was followed, and then we permitted them to be passed among the jurors so that you could get an idea what the whole area of this yard was like, the tracks, and so forth, to help you understand the testimony that came later. These were properly (351) brought up at the very beginning of the trial, almost equivalent to a visit down there yourself and looking at the yard. That is what that was for.
 "Now, yesterday when Mr. Richter was giving his closing speech in answer to Mr. Voorhees, — Mr. McConnell had not spoken yet — Mr. Richter told you that he had at lunchtime with his partner, Mr. Lord, outlined to him, that is, to Mr. Lord, something of the situation there. He said Mr. Lord had asked what kind of a case he was trying, and so forth, and he was in the courtroom here from time to time because he was in another case in an adjoining room and had another case to be tried by me later when I got through here. So, he came in and wanted to know what the case was about. I am trying to lay this matter before you just as it happened; it is awfully important and I am taking the trouble to give you the whole situation and I would like to know how you feel about it. He said that he himself made this sketch there — you can see it — it is a rough drawing, and he went on to tell you in his closing remarks what his conception was of the location of the tracks and certain deductions that could be drawn from the location of the different objects, the trains, and so forth, and held it up to you in this manner, as I understand. (Demonstrating.) It wasn't passed to you (352) but he held it up. Now, what I want to ask you is this, that happened right in the presence of all of us, and so that there will be no misunderstanding if this case goes up to another court for trial, I want to knew whether or not when Mr. Richter held up the paper and spoke about it that way whether that carried any conviction to you, or brought about an impression on you — the drawing itself, not the inferences to be drawn, but whether the drawing was considered by you as being in evidence before you or did it have any weight in the formation of your opinion up to that time.
 "If it did with any of you, will you raise your hand?
 (Juror No. 11 raises hand.)
 "The Court: It had weight with you?
 "Juror No. 11: I couldn't see it very good.
 "The Court: You couldn't see it?
 "Juror No. 11: He kept shaking it.
 "The Court: That is Juror No. 11, he couldn't see it.
 "Could any of you make that out with sufficient clarity to be led to a conclusion or have your judgment affected by it in any way?
 "A Juror (No. 3): It seems to me — I saw it, (353) but the photographs were much more clearer.
 "The Court: Will you repeat that?
 "A Juror (No. 3): I saw it when it was held up, but —
 "The Court: You are No. 3 juror?
 "A Juror (No. 3): Yes, I saw it, but I thought that the photographs were clearer.
 "The Court: Did it have any weight with you at all?
 "A Juror (No. 3): No, not at all.
 "The Court: The answer is `No'. That is all I wanted to know because if it did then I might have to charge you further because the only thing that the jurors can consider, members of the jury, are the things that are properly passed upon, and I wouldn't want to have a paper not passed upon submitted to you in any way. I would have to tell you that this couldn't possibly have any legal weight with you. You couldn't possibly give it any consideration at all. You know that. All right. Now, I am going to charge. * * *"