BONUVENTURA BATTAGLIA, PLAINTIFF-RESPONDENT, v. HENRY K. NORTON, TRUSTEE OF THE NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, A BODY CORPORATE, DEFENDANT-APPELLANT.

THERESA DANN, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILFRED DANN, DECEASED, PLAINTIFF-RESPONDENT, v. HENRY K. NORTON, TRUSTEE OF THE NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, DEFENDANT-APPELLANT.

Argued September 8, 1954—Decided September 27, 1954.

*Mr. Raymond W. Troy* argued the cause for appellant (*Mr. Vincent P. Biunno,* on the brief; *Messrs. Lum, Fairlie & Foster,* attorneys).

*Mr. John J. Breslin, Jr.,* argued the cause for the respondent Battaglia (*Messrs. Breslin & Breslin,* attorneys).

*Mr. Paul J. O'Neill* argued the cause for the respondent administratrix, Theresa Dann (*Mr. George W. King,* attorney.)

The opinion of the court was delivered by

HEHER, J. The question here is whether the circumstances attending a railroad grade-crossing collision bespeak contributory negligence as a matter of law precluding recovery by the injured operator of the motor vehicle and the next of kin of his fatally injured companion and fellow servant in a common employment.

This was deemed to be an issue of fact for the jury; and the propriety of the submission is the subject of inquiry here. There was a verdict of $50,000 for Battaglia, and $75,000 for the administratrix. The Appellate Division of the Superior Court affirmed the consequent judgments. The cases are here by certification at the instance of the defendant trustee. 15 *N. J.* 380.

The collision occurred May 6, 1952, at 6:45 P. M., Daylight Saving Time, in North Bergen, New Jersey, at the grade crossing ·formed by the intersection almost at a right angle of Secaucus Road, running generally east and west, and the southbound ˙tracks of the New York, Susquehanna and Western Railroad Company and the northbound tracks of the Northern Railroad, four sets of tracks in all. By agreement, the two easterly sets of tracks were used by both Susquehanna and the Erie Railroad Company for passenger and freight traffic, northbound, and the two westerly tracks for southbound traffic. There was an area 56 feet wide between the northbound and southbound tracks, extending north of the crossing and 2,000 feet to the south, free of obstruction save a succession of telegraph poles running midway both north and south of the crossing, about 69 feet apart (29 of which were south of the crossing), and a mound of earth covered by grass and plant life rising from 2½ feet to between 5 and 7 feet, according to the varying estimates of witnesses. The crossing was protected as a single unit. There were an automatic electric flasher, bell signals, and the standard crossbar warning device at the extreme westerly side of the crossing, on the southerly side of Secaucus Road, and at the extreme easterly side of the crossing, on the northerly side of

Secaucus Road. The flasher and bell signals were activated by train and rail contact within the signal circuit, north of the crossing on the Susquehanna or southbound tracks and south of the crossing on the Erie or northbound tracks. There was a siding 75 feet north of the crossing, extending from the westerly Susquehanna track into a packing plant.

Battaglia and the deceased Dann were on their way to New York in their employer's 1924 Mack truck, and in his service. When they reached the crossing, coming from the west, Susquehanna was engaged in a freight-car drilling or switching operation on its westerly southbound tract in connection with the siding north of the crossing, and Battaglia brought his vehicle to a stop. The crossing flasher and bells were in action. After a lapse of five minutes, Susquehanna's brakeman, Terwilliger, disconnected the rear seven cars of the train then obstructing the crossing, at a point 75 feet north of the crossing, and the engine and ten cars, Terwilliger aboard the last car, proceeded south until the last car had passed over the crossing, when the train was halted on a signal given the engineer by Terwilliger, who thereupon alighted and, standing at the right rear and to the west of the last car, at a point not more than 20 feet south of the crossing, according to the plaintiffs' proofs, signaled the waiting drivers of vehicles on the west side of the crossing, among them Battaglia, first in line, to pass over the crossing. The adverse crossing signals the while remained in action; the detached cars were still within the signal circuit, and the signal contact continued. Proceeding over the crossing at the rate of between five and eight miles an hour, the truck was struck by a northbound Erie train. It was raining at the time. Battaglia testified the brakeman called to him as he gave the onward signal by a wave of the hand: "Go ahead, nobody is coming." The brakeman denied that, by word or deed, he gave the safe-crossing sign. He insisted that all his hand signals were directed to the train engineer alone; there is the suggestion of misinterpretation, although this could not be true of his oral direction to Battaglia. But

the brakeman agreed he heard no whistle or bell signal from the engine of the oncoming Erie train, and he was unaware of its approach until the occurrence of the collision, and the "sole purpose" of moving the train from the crossing was to permit the flow of vehicular traffic over the crossing. He said: "We held the crossing five minutes, or about five minutes. According to law, you are not allowed to hold it any longer than that, so naturally I had to clear up the crossing and let traffic cross." Although this was a scheduled Erie train, and he had on prior occasions worked with a drill engine at the particular time, and trains had "probably passed by at that time," he did not know "for sure that there was a train scheduled at that time." The giving of the clear signal was affirmed by all the occupants of motor vehicles in line following Battaglia's vehicle, and by four boys also waiting to go over the crossing on foot. To all the hand signal signified crossing safety. Terwilliger had but four months' experience as a brakeman. Erie was absolved of responsibility by the jury.

Conceding that the evidence raised a jury question as to Terwilliger's guilt of negligence attributable to Susquehanna under the common-law maxim of *respondeat superior,* it is yet insisted that Battaglia and his fellow worker were not entitled to rely "entirely" on the brakeman, "who was in no position to make a better observation than they;" that "upon clearing the freight, they were in a superior position and bound to use reasonable care to make an independent and reasonably effective observation for their own safety," and the conclusion is irresistible either (a) that Battaglia "made his last observation when he reached the line of poles," where "he could not possibly see," or (b) "kept looking all the way past the poles but didn't see or hear the Erie train until it was upon him," and "proceeded heedlessly from a place of safety into the very path of the locomotive which he must have seen and heard," and so there was a departure from the common-law standard of duty so clear and indubitable as to put the question beyond the realm of fair debate. Reliance

is placed upon *Berry v. Pennsylvania R. Co.,* 48 *N. J. L.* 141 (*E. & A.* 1886); *Pennsylvania R. Co. v. Pfuelb,* 60 *N. J. L.* 278 (*Sup. Ct.* 1897); *Swanson v. Central R. Co.,* 63 *N. J. L.* 605 (*E. & A.* 1899); *Conkling v. Erie R. Co.,* 63 *N. J. L.* 338 (*E. & A.* 1899); *George Siegler Co. v. Norton,* 8 *N. J.* 374 (1952), these cases among others of like tenor.

It is also urged that the Appellate Division in effect held that the "contributory negligence of the plaintiffs is to be excused if it was 'induced' by the defendant's conduct,"— *i. e.,* the brakeman's invitation to go upon the crossing, and thus the refusal to hold the plaintiffs contributorily negligent as a matter of law was rested on a theory of "comparative negligence," in disregard of the law of New Jersey.

These are not valid considerations supporting the tendered thesis.

First, the proffered theory of comparative negligence necessarily hypothesizes negligence by Battaglia and the deceased Dann in their entry upon the crossing in response to the negligent all-clear signal given by the brakeman, "excused" because "induced" by his fault. The issue is conceived to be whether the brakeman in this regard was "more or less negligent than Battaglia, and by how much," and whether Battaglia and Dann, the possessors of "superior knowledge of the characteristics of the crossing," were "more or less negligent than the brakeman, and by how much." It is said that such an inquiry involves "a study, not of the causal relation between the act of plaintiffs and the event," but rather "a consideration of a causal relation between the asserted negligence of the defendant and the contributory negligence of the plaintiffs," and the latter relation is alien to the law of New Jersey, suggesting, it is said, that "because the negligence of the plaintiff followed that of the defendant it was caused by it."

But in this there is a basic misconception of the significance of the brakeman's invitation to cross. As we have said, it was conceded that the proofs in that regard raised a question for the jury on the issue of primary negligence

laid to Susquehanna. If this allegation of fact was sustained by the proof, then the jury could have found that Battaglia and Dann were lulled into a false sense of security by the brakeman's negligent performance of his assumed responsibility; and while they remained under a duty of taking all reasonable precautions for their own safety in passing over the crossing, the fulfillment of the duty of self-security was by the same token an inquiry peculiarly within the province of the jury. It was not a question of comparative negligence, but rather whether under all the circumstances Battaglia and Dann were chargeable with negligence in any degree whatever proximately contributing to the mishap; in a word, whether they were guilty of negligence at all. The jury were told in unmistakable terms that a finding of contributory negligence would preclude recovery; there is no contention *contra*.

Again, it is suggested that "Even if negligent, the signal amounted to no more than saying, 'I have halted our drilling of the freight cars, and the crossing is not blocked. Go ahead.' It did *not* amount to saying, 'Even though you know there is another set of tracks which I cannot see, and even though there is a wide area between tracks where you can make sure no train is coming from the right as you know it must, just close your eyes and drive on through.' " This, too, is wanting in the factual certainty of fault that would preclude controversy among reasonable men, in the exercise of fair and impartial judgment.

The reasoning divides a grade crossing that has always been treated by the railroads themselves as a distinct unit for the installation of signal facilities to warn and protect the travelling public. The brakeman undertook to clear the crossing for public travel; and it was for the jury to say whether his signal was reasonably interpreted as an assurance of safe passage throughout, notwithstanding the continuance of the flasher and bell warnings. Indeed, Battaglia said he had the brakeman's verbal assurance as well of crossing safety. On that hypothesis, the brakeman had assumed the function and responsibility of a crossing watchman; and it cannot

be a conclusive circumstance that the brakeman, if Battaglia was fully aware of his restricted view, was not in a position to make an effective observation to the south. It was an altogether reasonable assumption that the brakeman had knowledge of scheduled trains, and was otherwise informed in relation to the safety factor, or he would not have given the word.

Battaglia affirmed as a witness that he was mindful of his own safety and to this end had made what he deemed to be an effective continuing observation to the south after his truck passed the line of freight cars standing on the westerly track and entered the space between the southbound and northbound tracks. He spoke of the limited vision to the south, not more than 100 feet at the critical point, due to the mound of earth and the vegetation, the varying elevation, the telegraph poles, and the rain and evening half light. He listened for the sounds of an approaching train, and there were none. None of the seven witnesses called by plaintiffs heard a locomotive whistle or bell. And there was evidence that the headlight of Erie's locomotive was dim. Defendant points to what it characterizes a fatal modification of Battaglia's testimony on cross examination,—*i. e.*, that his last look to the south was at the line of poles. There is, however, photographic evidence of another pole halfway between the line of poles and the nearest rail of the westerly Erie track which he may well have had in mind and which may have had an adverse effect on view. And the witness was an untutored immigrant not given to preciseness in the use of the English language; he remained unconscious for four weeks after the collision, and he said his memory had suffered impairment. It was the special function of the jury to assess the quality of the plaintiff's testimony in the light of all the circumstances, an inquiry in which the demeanor and bearing of the witness were no doubt revealing factors. And the proofs afford no basis for holding the deceased Dann negligent as a matter of law.

The defendant trustee would raise a conclusive presumption of negligence from the mere fact of the collision

itself. But contributory negligence is an affirmative defense to be proved; and ordinarily the issue is one for the fact-finding tribunal. Such is the case where different minds may reasonably come to different conclusions as to the facts or may reasonably disagree as to the inferences derivable from the facts, controverted or uncontroverted. *Kaufman v. Pennsylvania Railroad Co., 2 N. J.* 318 (1950); *Mellon v. Pennsylvania-Reading Seashore Lines, 7 N. J.* 415 (1951); *Gudneslad v. Seaboard Coal Dock Co.,* 15 *N. J.* 210 (1954). Only in the clearest case of contributory fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for decisive action by the court. Care is to be taken that the reasonable man be not endowed with attributes which properly belong to a person of exceptional perspicuity and foresight. *Taneian v. Meghrigian,* 15 *N. J.* 267 (1954). The case is within the rationale of the somewhat similar New Jersey case of *Smith v. Erie R. R. Co., 7 N. J. Misc.* 75 (*Sup. Ct.* 1929), and the Michigan case of *Palton v. Grand Trunk Western Ry Co., 236 Mich.* 173, 210 *N. W.* 309 (*Sup. Ct. Mich.* 1926).

Affirmed.

*For affirmance*—Chief Justice VANDERBILT and Justices HEHER, OLIPHANT, BURLING and JACOBS—5.

*For reversal*—None.