44 N.J. Super. 429 (1957)
130 A.2d 863
FRANK MARTIN, PLAINTIFF-APPELLANT,
v.
BENGUE, INC., A CORPORATION, AND THOS. LEEMING & CO., INC., A CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1957.
Decided April 11, 1957.
*430 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. S. Arthur Stern argued the cause for plaintiff-appellant (Messrs. Stern and Fine, attorneys; Mr. Donald S. Kates, on the brief).
*431 Mr. James P. Beggans argued the cause for defendant Bengue, Inc. (Messrs. Carpenter, Bennett, Beggans & Morrissey, attorneys; Mr. Milton A. Dauber, on the brief).
Mr. Joseph Keane argued the cause for defendant Thos. Leeming & Co., Inc. (Messrs. Milton, McNulty & Augelli, attorneys; Mr. John B. O'Neill, on the brief).
The opinion of the court was delivered by CLAPP, S.J.A.D.
This action is brought by plaintiff against defendants Bengue, Inc. and Thos. Leeming & Co. Inc., for injuries sustained by him. He claims these injuries were the result of a breach of defendants' common law and statutory duties to warn users of an ointment, called "Ben-Gay," as to the inflammability of the vapors emitted by it. The ointment is manufactured by Bengue from a secret formula, and distributed by Leeming. Judge Artaserse for the Superior Court, Law Division, entered a judgment of involuntary dismissal at the close of plaintiff's case. He found, first, that there was no breach of duty on the part of the defendants; second, that even if there was such a breach, there was no causation between it and plaintiff's injuries and, third, that plaintiff was guilty of contributory negligence as a matter of law. Plaintiff brings this appeal.
For several days plaintiff had been home ill, suffering from a heavy cold. Each day his wife had rubbed on his chest, shoulders and neck a "medium" amount of Ben-Gay  substantially in the manner in which it was intended to be used. Just before the accident, and after such an application of the ointment, plaintiff had seated himself in a chair, conversing with his wife. At the time, he was wearing nothing but cotton pajamas which had become somewhat "greasy" from the application of the Ben-Gay to his body during these days. He attempted to light a cigarette, and about five or six seconds after striking the match, suddenly realized that he held in his hand only the stub of the match. Looking down, he saw that the *432 lower part of his pajama coat was on fire, burning with an ordinary yellowish flame about two or three inches in diameter. The fire was in his lap, some inches from where the Ben-Gay had been applied. He tried to pat it out; not succeeding in that, he jumped up continuing still with his patting motion, but the flame, somewhat fanned by his movements, spread very rapidly across the parts of his body covered with the ointment, burning him severely.
Were the defendants under a common law duty to warn users of Ben-Gay as to the inflammability of its vapors? On this point plaintiff's case depends in large measure upon the testimony of his experts. According to their testimony, Ben-Gay contains about 58% non-volatile matter, 8% water and the balance volatiles, namely, methyl salicylate 18% and menthol 17%. While cross-examining one of the experts, Leeming's counsel, Mr. Keane, put some Ben-Gay on his (Mr. Keane's) hand and had the expert apply a match to it, but neither the Ben-Gay, nor the vapors from it, caught fire. It is to be observed in this connection, as the expert testified, that methyl salicylate and menthol "vaporize at * * * room temperature." This expert said that the experiment proved that if the vapors of Ben-Gay are mixed with the air of the entire room, they will not burn. Likewise, he said, dangerous vapors from gasoline would not burn if it were poured on the floor of the courtroom. However, we are not given any idea at all as to what proportion of methyl salicylate vapor, or menthol vapor, to air will produce a combustible mixture.
On the other hand this expert testified to an experiment he had conducted out of the courtroom, indicating that if an ample quantity of Ben-Gay were applied to a surface and the surface was thereupon covered with plaintiff's pajamas, and if the pajamas were set on fire and the fire somewhat fanned (as when plaintiff moved about and patted himself), then any vapors from the Ben-Gay would not only ignite but cause the fire to spread extremely rapidly. The proofs show that methyl salicylate has a flash point (i.e., produces a puff of flame, not a fire) at 214° F (closed cup  2° *433 above the boiling point of water)  225° F (open cup); and its vapors burn continuously at about 10° above the flash point. We have no such information as to menthol. There was, however, testimony that the temperature of a burning match and also of cotton is 1200° to 1800° or 2000° , presumably Fahrenheit. Incidentally, the treasurer of Bengue, who is a chemist, stated in a deposition, without contradiction, that until this action was started his company's attention had never been called to the fact that Ben-Gay vapors are flammable.
It can reasonably be inferred from the foregoing facts that Ben-Gay vapors will burn at 224° -235° F  but only when the oxygen in the air is limited in quantity, as where it is confined by some article, such as the pajama coat, so as to form with the vapors a combustible mixture.
We deal first with the defendant Bengue. Plaintiff says that Bengue must "exercise reasonable care * * * to bring to the knowledge of" those using the ointment "such directions as will make it reasonably safe for the use for which it is put out." Restatement, Torts § 397. The crucial issue with respect to Bengue is, as we see it, whether such a use of the ointment would create a situation involving an unreasonable risk of injury. Zierer v. Daniels, 40 N.J. Super. 130, 134 (App. Div. 1956); Shaw v. Calgon, Inc., 35 N.J. Super. 319, 330 (App. Div. 1955). To turn it around, the issue is this: is the chance of injury so remote and so utterly unexpectable that a manufacturer of ordinary prudence would have disregarded it? Prosser, Torts (2d ed.), § 30; 2 Harper and James, Torts, § 16.9 (1956).
We conclude that plaintiff's proofs are not sufficient to take the case to the jury as to Bengue. As has already been said, we find that so far as the evidence goes, there is no risk of harm to a plaintiff unless he causes the Ben-Gay vapors to come in contact with a flame under his clothing or in a confined area. Obviously, the manufacturer is not under a duty to warn against the introduction of a flame under a person's clothing. But what possibilities are there *434 of a flame contacting the vapors in a confined area? Suppose a tube of the ointment is uncapped and then placed in a larger container. In what situations, reasonably to be expected, would danger then arise? Suppose, if one can, other situations where vapors from the ointment may meet with fire in some place where the oxygen is limited. How confined must the area be to give rise to the danger in case of a "medium" quantity of the ointment? We are quite at a loss in dealing with these questions and have not had the slightest assistance thereon, either from the proofs or from the full brief submitted on plaintiff's behalf. The evidence being what it is, we do not think plaintiff has presented a case demonstrating a risk which the ordinary prudent manufacturer would take measures to warn against.
If (as we hold) the manufacturer is not under a common law duty to warn users of the ointment as to the flammability of the vapors, we see no basis for subjecting the distributor, Leeming, to liability. Restatement, Torts, § 401 (Supp. 1948), cited by both plaintiff and defendants; cf. O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 334 (1953).
Plaintiff also relies upon the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A., § 301 et seq., particularly §§ 321, 331 and 352. 21 U.S.C.A., § 352 provides that a drug shall be deemed to be misbranded if its labeling is misleading. Plaintiff refers us to 21 U.S.C.A., § 321(n) which states that
"in determining whether the labeling is misleading there shall be taken into account (among other things) * * * the extent to which the labeling fails to reveal facts material * * * with respect to consequences which may result from the use of the article to which the labeling relates * * * under such conditions of use as are customary or usual" (Italics added.)
We find no case indicating that this statute was designed to require warnings to be given by defendants in order to prevent a fire. However, aside from that, it must be said *435 that the setting on fire of the clothing of a person covered with Ben-Gay (or the application of any fire to the ointment's vapors in a confined area) is not a "customary or usual" condition under which it is used.
Judge Artaserse properly held that there was no proof, sufficient to go to the jury, that either of the defendants had breached any duty it had under the common law or the statutes cited. We therefore need not consider the questions of proximate causation and contributory negligence.
Affirmed.