FRANK MARTIN, PLAINTIFF-APPELLANT, v. BENGUE, INC., A CORPORATION, AND THOS. LEEMING & CO., INC., A CORPORATION, DEFENDANTS-RESPONDENTS.

Argued November 4, 1957—Decided December 9, 1957.

*Mr. S. Arthur Stern* argued the cause for the appellant (*Messrs. Stern and Fine,* attorneys).

*Mr. James P. Beggans* argued the cause for the respondent Bengue, Inc. (*Messrs. Carpenter, Bennett, Beggans & Morrissey,* attorneys; *Mr. Milton A. Dauber,* on the brief).

*Mr. Joseph Keane* argued the cause for the respondent Thos. Leeming & Co., Inc. (*Messrs. Milton, McNulty & Augelli,* attorneys; *Mr. John B. O'Neill,* on the brief).

The opinion of the court was delivered by
JACOBS, J.   The Appellate Division affirmed the trial court's judgment of dismissal at the close of the plaintiff's

case. *Marlin v. Bengue, Inc.*, 44 *N. J. Super.* 429 (*App. Div.* 1957). We granted certification under *R. R.* 1 :10–2.

On February 4, 1953 the plaintiff suffered severe injuries. He claims that his injuries were the result of the defendants' negligence in failing to warn him, as a user of their ointment "Ben-Gay," as to the flammability of the vapors which it emitted. In support of his claim he introduced lay and expert testimony which, he contends, was legally sufficient to withstand the defendants' motion for dismissal and call for their defensive testimony. He stresses the principle that, notwithstanding doubts as to credibility and adequacy, the trial court was obliged, in ruling on the motion, to accept the plaintiff's portrayal as evidenced by the most favorable testimony introduced on his behalf along with all favorable inferences which the jury might properly draw therefrom. See *O'Donnell v. Asplundh Tree Expert Co.*, 13 *N. J.* 319, 328 (1953); *Nierman v. Casino Arena Attractions, Inc.*, 46 *N. J. Super.* 566, 569 (*App. Div.* 1957). That portrayal may fairly be summarized as follows:

The plaintiff had a heavy cold and had been home for several days. About twice each day his wife had rubbed a medium amount of Ben-Gay on his chest, shoulders, and neck substantially in accordance with the directions for its use. On the morning of February 4, after a customary application, the plaintiff seated himself in a living room chair. He was then dressed in the same cotton pajamas which he had been wearing for several days and his pajama top had become rather greasy from its contact with the Ben-Gay. While listening to the radio and talking to his wife who was in the kitchen, he attempted to light a cigarette. After striking the match he suddenly realized that its head had fallen off and that the lower part of his pajama top was burning. Still seated, he unsuccessfully tried to pat the fire out. He then jumped up still continuing his patting motion. The fire spread rapidly across the portions of his body which had been covered with Ben-Gay. In the plaintiff's language "it like exploded, you might say." He immediately called to his wife who found him

"completely enveloped in flames." She tore off the pajama top, applied a home remedy for his burns, called the doctor, and took him to the hospital where he remained for over a month. He suffered very severe burns, particularly about his "chest, shoulder, face and ears."

The plaintiff started to use Ben-Gay many years ago and testified that he had probably then read its accompanying literature. Similarly his wife testified that she was "an old user of Ben-Gay," had read the legend on the package, was familiar with the directions which accompanied it, and found "nothing that said it was dangerous to use." The tube which contained the Ben-Gay and the directions which accompanied it contained nothing whatever as to flammability. The directions did contemplate that the pajama top would be worn after the ointment had been applied and the plaintiff's position is that the vapors emitted by the Ben-Gay, when confined between the pajama top and the body, were flammable. In support he introduced testimony by Messrs. Bechtoldt and Kanengieser, both graduate chemists. Mr. Bechtoldt had analyzed Ben-Gay and testified that it "was broken down into fifty-eight and a fraction percent of non-volatile, and approximately thirty-five percent volatile, and eight percent of water." The volatile matter which vaporized at room temperature was methyl salicylate and menthol and the non-volatile matter was petrolatum and lanolin. Mr. Bechtoldt had examined the pajama trousers which the plaintiff had worn on the morning he was burned and found that it was composed of cotton fibers without any synthetics. When a flame was applied it "burned with moderate intensity," as does cotton material generally. He had also tested the material with a mixture of methyl salicylate and menthol but his answer that he "found that the material burned with increased—" was interrupted and remained unfinished when objection to the question was sustained by the trial court. Later the witness answered in the affirmative when the trial court asked him whether vaporization of the Ben-Gay would "cause a flame, which has already been ignited on a pajama coat such as you have examined, and

material such as you have examined, to burn quicker." He expressed the opinion that there was a causal relationship between the vapors which the Ben-Gay had emitted and the plaintiff's injuries, but was unable to say "to what degree" the plaintiff would have been burned if he had no Ben-Gay on him.

Mr. Kanengieser testified that if subjected to sufficient heat Ben-Gay "burns away practically completely." He acknowledged that the touching of a lighted match to a quantity of Ben-Gay placed in the open palm of the hand would probably not cause the Ben-Gay to burn because it would not "make the vapors hot enough." But he differentiated that situation as not involving confined vapors between the body and the pajama top, but as involving vapors mixed with air in the entire room. He expressed the opinion that in the instant matter there was a causal relationship between the Ben-Gay and the ensuing fire; he stated that "the probabilities are that the major portion of the burning, of the rapid spread, was done by the flammable vapors there first, and the spread of the fire in the cloth continued more slowly. But the very rapid thing was the vapors. It's what is known as a flash fire." He testified as to an experiment which he had conducted out of the courtroom. He had spread some Ben-Gay on an asbestos pad and loosely placed a piece of the plaintiff's pajama trousers on top of it. He allowed it to remain there for 30 minutes and then hung the piece of pajama overnight. On the following day he spread some more Ben-Gay on an asbestos board, placed the piece of pajama loosely on it and later ignited the pajama at one end. He picked up "one end of the pajama and dropped it down again, as a person might if he were moving about." At first there was a small flame which charred the cotton and then suddenly there was a "quick burning up." He expressed the opinion that "what happened was that instead of just the cloth burning, the vapors that were underneath the cloth, between the cloth and the asbestos, reached the point at which they were ignited" and then there was "a flash fire underneath from the vapors that were there." In re-

sponse to the trial court's inquiry as to what would have happened if the plaintiff had used Vaseline (petroleum jelly) instead of Ben-Gay, the witness testified that "he could hit it out with his hands"; in elaboration he added, "the flash fire would not have occurred. It was not the lanolin, the fat that caused the flash fire. He could have, by hitting it, probably put it out, because it requires a much higher temperature to vaporize the Vaseline. In fact methyl salicylate and menthol vaporize at this room temperature. So that without a fire, the vapors are there to begin with. What happened is that the burning pajamas made the vapors reach a point at which they ignited." Further on in his testimony he expressed the view that "Vaseline, cold cream, and things of that sort, would not have added the great possibility of the spread of the fire in the way in which these volatile substances did."

The testimony indicated that the methyl salicylate in Ben-Gay has a flash point (produces a puff of flame, not a fire) at about 225°F and that its vapors burn continuously at about 235°F. It also indicated that the temperature of a burning match and burning cotton is between 1200° and 2000°F. From this, coupled with the remaining evidence in the record, the Appellate Division found that it could reasonably be inferred that Ben-Gay vapors would burn at about 235°F "only when the oxygen in the air is limited in quantity, as where it is confined by some article, such as a pajama coat, so as to form with the vapors a combustible mixture." It then determined, as a matter of law, that the chance of injury was "so remote and so utterly unexpectable that a manufacturer of ordinary prudence would have disregarded it." 44 N. J. Super. at page 433. The plaintiff urges that this determination was erroneous and that his proofs sufficiently presented a factual issue for the jury's determination as to whether, in the Appellate Division's language, the chance of injury was so remote and utterly unexpectable as to obviate any duty to warn the plaintiff as to the flammability of the vapors emitted by Ben-Gay. In view of its determination that

there was no showing of negligence, the Appellate Division found no need to "consider the questions of proximate causation and contributory negligence"; on these issues the trial court had made findings against the plaintiff. Here the plaintiff urges that the trial court had erred in ruling, as a matter of law, (1) that the defendants' alleged negligence was not the proximate cause of the plaintiff's injuries and (2) that the plaintiff was guilty of contributory negligence.

The tort responsibilities of manufacturers and suppliers have been fully discussed in recent judicial decisions in our State and in many legal publications elsewhere. See *O'Donnell v. Asplundh Tree Expert Co., supra; Shaw v. Calgon, Inc.,* 35 *N. J. Super.* 319, 330 (*App. Div.* 1955); *Zierer v. Daniels,* 40 *N. J. Super.* 130, 133 (*App. Div.* 1956); 2 *Harper & James, Torts* 1534 (1956); *Prosser, Torts* 497 (*2d ed.* 1955); *Dickerson, Products Liability and the Food Consumer* 110 (1951); *Dillard & Hart, "Product Liability: Directions for Use and the Duty to Warn,"* 41 *Va. L. Rev.* 145 (1955). In the *O'Donnell* case Chief Justice Vanderbilt carefully reviewed the decisions which had abandoned the requirement of privity of contract and pointed approvingly to the trend of the law towards imposing broad liability upon manufacturers and suppliers for injuries resulting from their failure to exercise reasonable care in the manufacture and distribution of their products. Their negligence may involve the production and sale of defective products with resulting foreseeable injury; here the courts no longer find difficulty in sustaining liability. See *O'Donnell v. Asplundh Tree Expert Co., supra; M. Dietz & Sons, Inc. v. Miller,* 43 *N. J. Super.* 334 (*App. Div.* 1957); *Nathan v. Electriglas Corp.,* 37 *N. J. Super.* 494 (*App. Div.* 1955); *Pierce v. Ford Motor Co.,* 190 *F. 2d* 910 (4 *Cir.* 1951), *certiorari* denied 342 *U. S.* 887, 72 *S. Ct.* 178, 96 *L. Ed.* 666 (1951); *Annotation, "Liability of seller of article not inherently dangerous for personal injuries due to the defective or dangerous condition of the article,"* 168 *A. L. R.* 1054 (1947). On the other hand, the products may not be defective but the manufacturers and suppliers may negligently

fail to warn of concealed dangers with resulting foreseeable injury; here again the courts find no difficulty in sustaining liability. See *Orr v. Shell Oil Co.*, 352 *Mo.* 288, 177 *S. W.* 2d 608 (1944); *Noone v. Fred Perlberg, Inc.*, 268 *App. Div.* 149, 49 *N. Y. S.* 2d 460 (1944), affirmed 294 *N. Y.* 680, 60 *N. E.* 2d 839 (1945); *Farley v. Edward E. Tower & Co.*, 271 *Mass.* 230, 171 *N. E.* 639, 86 *A. L. R.* 941 (1930); Frank, J., dissenting in *Hentschel v. Baby Bathinette Corp.*, 215 *F.* 2d 102, 105 (2 *Cir.* 1954), *certiorari* denied 349 *U. S.* 923, 75 *S. Ct.* 663, 99 *L. Ed.* 1254 (1955); *Dillard & Hart, supra; Restatement, Torts,* § 388 (1934). In *Tomao v. A. P. De Sanno & Son,* 209 *F.* 2d 544, 546 (3 *Cir.* 1954), the court properly noted that "if the manufacturer owes a duty to use due care in making his products, he owes also the companion duty to warn of the latent limitations of even a perfectly made article, the use of which, however, is dangerous if the user is ignorant of those limitations and the manufacturer has no reason to believe he will recognize the danger."

In the *Orr* case, *supra,* the Whitmire Research Corporation manufactured an insect spray for the Shell Oil Company which had furnished the formulae and specifications, the chemicals and other ingredients, and the cans and containers. The plaintiff Orr was an employee of the Research Corporation and suffered a skin infection from contact with one of the chemical ingredients of the spray. He sued the Shell Oil Company, claiming that it was negligent in failing to warn him of the dangers inherent in the chemical. In the course of its opinion sustaining the jury's verdict for the plaintiff the Supreme Court of Missouri said:

"The rule is now well settled that a duty is imposed upon the one who furnishes an article which he knows, or ought to know, to be peculiarly dangerous to give notice of its character or bear the natural consequences of his failure to do so. This rule originated as an exception to the general rule of nonliability where no privity of contract exists, and was applied in cases involving injuries from poisonous drugs, chemicals, explosives or articles inherently dangerous to person or property. See *Callahan v. Warne,* 40 *Mo.* 131; *Heizer v. Kingsland & Douglass Mfg. Co.,* 110 *Mo.*

605, 19 *S. W.* 630, 15 *L. R. A.* 821, 33 *Am. St. Rep.* 482; *Lenz v. Standard Oil Co. of New York*, 88 *N. H.* 212, 186 *A.* 329. The rule has been extended to cover articles not only inherently dangerous in their nature, but dangerous because of the use to which they are to be put by whoever may use them for the purpose intended. See *Annotation* 17 *A. L. R.* 683. *McLeod v. Linde Air Products Co.*, 318 *Mo.* 397, 1 *S. W.* 2d 122. The danger is none the less inherent because it is brought into action by some external force. *Farley v. Edward E. Tower Co.*, 271 *Mass.* 230, 171 *N. E.* 639, 86 *A. L. R.* 941. The basis of liability is not in contract but arises from a social responsibility to use due care to avoid injuring those persons likely to be injured if such care is not used." 177 *S. W.* 2d at *page* 612.

In the *Farley* case, *supra* [271 *Mass.* 230, 171 *N. E.* 2d 641], the plaintiff was having a "water wave" in a hairdressing establishment. While her wet hair was being dried with hot air from an electric dryer, combs, which had been placed in her hair by the hairdresser's attendant, took fire and burned her head. The combs had been bought from a dealer who had in turn bought them from the manufacturer. The evidence indicated that the combs were composed principally of pyroxylin, which is ignitable by the direct application of heat without flame. The plaintiff brought an action against the hairdresser, the dealer, and the manufacturer. The jury returned a verdict for the hairdresser and against the dealer and the manufacturer. In sustaining the jury's verdict the Supreme Judicial Court of Massachusetts expressed the view that it could fairly be inferred from the evidence that the combs would be used in connection with a machine designed to produce heat unless warning of the hazard was given and that the jury "could have found that such use should have been foreseen by the dealer and was a natural and probable consequence of its sale of the combs without notice of their dangerous character." It pointed out that "even if such a use of pyroxoloid combs was unprecedented, it would not follow necessarily that it was outside the field of general probability." And on the issue of proximate causation it found that "the acts of the hairdresser and her attendant were not intervening causes which broke the causal connection." See *Squire v. F. W. Wool-*

*worth Company,* 263 *N. Y.* 532, 189 *N. E.* 684 (1933). But *cf. Smith v. S. S. Kresge Co., Inc.,* 79 *F. 2d* 361 (8 *Cir.* 1935).

In the *Noone* case, *supra* [268 *App. Div.* 149, 49 *N. Y. S. 2d* 461], the plaintiff was severely burned when her evening gown ignited and enveloped her in flames. She was at a party among guests who were smoking and a lighted cigarette had apparently come in contact with her gown which had a netting treated with nitro-cellulose sizing. An expert testified that he had conducted an experiment which disclosed that the netting while unsized burned slowly, but that after it had been treated with a solution of nitro-cellulose it "flared up in a flash of flame when touched with a lighted cigarette or match." The plaintiff's jury verdict against the manufacturer of the dress was sustained by New York's appellate courts. In the course of his opinion for the Appellate Division, Justice Dore pointed out that the manufacturer "knew or should have known" that the sized evening gown would be worn among people who indulge in smoking, thereby entailing the danger of substantial harm, and found the following principle to be applicable:

"The rule in this State is now settled that when a manufacturer sells an inherently dangerous article for use in its existing state, the danger not being known to the purchaser and not patent, and notice is not given of the danger or it cannot be discovered by reasonable inspection, the manufacturer is legally liable for personal injuries received by one who uses the manufactured article in the ordinary and expected manner. *Thomas v. Winchester,* 6 *N. Y.* 397, 57 *Am. Dec.* 455; *MacPherson v. Buick Motor Co.,* 217 *N. Y.* 382, 111 *N. E.* 1050, *L. R. A.* 1916 *F,* 696, *Ann. Cas.* 1916*C,* 440; *Genesee County Patrons Fire Relief Ass'n v. L. Sonneborn Sons,* 263 *N. Y.* 463, 468, 189 *N. E.* 551, 552; *Crist v. Art Metal Works,* 230 *App. Div.* 114, 117, 243 *N. Y. S.* 496, affirmed 255 *N. Y.* 624, 175 *N. E.* 341; *Commissioners of State Insurance Fund v. City Chemical Corporation,* 290 *N. Y.* 64, 48 *N. E. 2d* 262; *Shearman & Redfield* on *Negligence,* Vol. Four (*Rev. Ed*) § 654 *et seq; Restatement, Torts,* § 395 *et seq.*"

In the *Hentschel* case, *supra* [215 *F. 2d* 103], the plaintiffs had purchased a bathinette which they placed in their bathroom. A fire broke out and when it reached the bathinette

it ignited its supports which were made of a magnesium alloy known as MF and which burned fiercely. The plaintiffs and their children were in their apartment at the time of the fire, and the danger to them, as well as to the apartment and its furnishings, "was much increased by the burning magnesium alloy." The plaintiffs were burned in getting their children safely out of the apartment. They sued the manufacturer of the bathinette as well as the retail dealer. Their evidence indicated that the magnesium alloy began to burn after it had been subjected to heat from some other source and that when it did begin to burn "the fire increased in intensity and was extremely difficult to extinguish with water since the use of water not in sufficient quantity to overwhelm such a fire will cause the release of inflammable hydrogen." The trial court submitted the matter to the jury but made it plain that there should be no recovery if the bathinette was ignited because "it became subjected to flames from a previously started fire." The jury returned a verdict for the defendants and the ensuing judgment against the plaintiffs was sustained on appeal. Judges Chase and Swan, though generally approving the principles expressed in the cases cited earlier in this opinion, found that neither the manufacturer nor the retail dealer was liable for a result which was brought about by subjection of their product "to unusual and extraordinary conditions." Judge Frank, dissenting, pointed out that the "breaking out of a fire in a household is surely not improbable, unlikely, or unforeseeable"; that the defendants knew or should have known that "the presence of the bathinette could easily transform an ordinary house or apartment into a fire-trap"; and that under the circumstances the defendants fairly owed a duty to warn of "this dangerous attribute of the magnesium." See *Dillard & Hart, supra,* at p. 165, n. 62. *Cf. Hartmon v. National Heater Co.,* 240 *Minn.* 264, 60 *N. W. 2d* 804 (1953), where the decedent, while attempting to start a gas conversion burner manufactured by the defendant, removed a plug which allowed gas to escape into the conversion chamber of the furnace where it exploded. In sustaining

the plaintiff's recovery, the Supreme Court of Minnesota held that the issue of whether the defendant was negligent in failing to warn about the removal of the plug was properly submitted to the jury for its determination.

██ While the manufacturer of a product is not an insurer of its safety, he is under a duty of care to avoid all unreasonable risks of harm from its use. When such risks are foreseeable, he must take reasonable precautions to avoid them. Within broad outer limits fixed by the court, the issue of foreseeability is properly left to the jury. Professors Harper and James have put it this way:

> "The courts, of course, set the outer boundary to what a man may reasonably be held to foresee. But a judgment upon this question, in the nature of things, may be exercised within wide limits, and this is one of the focal points where the concept of negligence is being expanded. Not only have the scientific advances noted above enlarged the scope of what a jury may find to be foreseeable, but a quickening social conscience and the general trend towards wider liability have led the courts to perceive risks in ordinary activities of men where not so long ago they ruled them out of the permissible range of what might be found." 2 *Harper & James, supra,* at *page* 916.

██ The fact that the product may have been used by many people over a considerable period of time without prior injury would not preclude the finding of foreseeability and negligence. See *Farley v. Edward E. Tower & Co., supra; Johnson v. Kosmos Portland Cement Co.,* 64 *F. 2d* 193, 196 (6 *Cir.* 1933), *certiorari* denied 290 *U. S.* 641, 54 *S. Ct.* 60, 78 *L. Ed.* 557 (1933). *Cf. Vander Groef v. The Great Atlantic & Pacific Tea Co.,* 32 *N. J. Super.* 365, 371 (*App. Div.* 1954); *McCormick, Evidence,* 353 (1954); *Morris,* "Proof of Safety History in Negligence Cases," 61 *Harv. L. Rev.* 205 (1948). And the fact that the injury may have followed upon the application of an intervening force such as fire would not preclude the finding that the intervening force was itself a foreseeable risk which the defendant should have guarded against. See *Johnson v. Kosmos Portland Cement Co., supra; Prosser, supra* at

p. 266.  Cf. *Menth v. Breeze Corporation, Inc.,* 4 N. J. 428, 440 (1950).

█ In the light of the foregoing principles we have concluded that in the instant matter the Appellate Division erred in holding that the plaintiff's showing of negligence was insufficient to withstand the defendants' motion to dismiss. The totality of the evidence, viewed most favorably towards the plaintiff at this preliminary stage, was legally sufficient to enable a jury to find that when Ben-Gay is applied it emits vapors, which, when confined between the body and a pajama top will burn with very high intensity and rapidity when ignited; that the defendant Bengue, Inc., as the manufacturer, and the defendant Thos. Leeming Co., Inc., as its sole United States distributor, had employed chemists to analyze the product and knew or should have known of the described flammability of its vapors; that the defendants knew or should have known that users of the product might indulge in smoking or otherwise incur the danger of igniting the confined Ben-Gay vapors; that in the exercise of reasonable prudence they would have warned the users of the danger; and that their failure thus to warn the users constituted actionable negligence. The defendants strenuously urge that "the risk of injury from the ignition of Ben-Gay is so far beyond the realm of probability and of normal experience as to excuse the defendants from foresight thereof." While a jury might so find, it might also reasonably find otherwise. The number of smokers has been estimated to be between 55 and 60 millions. See *Haenszel, Shimkin & Miller, Tobacco Smoking Patterns in the United States,* 49 (*Public Health Monograph No. 45,* 1956). And "Matches—Smoking" is listed as the major single origin of reported fires. See *National Board of Fire Underwriters, Report of the Committee on Statistics and Origin of Losses,* 6 (1957). It seems to us that the danger of igniting the confined vapors, by a match, cigarette or otherwise, cannot fairly be said to have been so patently remote as to justify the court's withdrawal from the jury of its normal function of passing on the issue of foreseeability. See 2 *Harper &*

*James, supra,* at *p.* 936; *Dillard & Hart, supra,* at *p.* 157. *Cf. Maize v. Atlantic Refining Co.,* 352 *Pa.* 51, 41 *A.* 2*d* 850, 160 *A. L. R.* 449 (1945).

The defendants contend that the plaintiff has failed to provide any evidence that, were it not for the active ingredients (methyl salicylate and menthol) in Ben-Gay, the plaintiff "would have been able to put the fire out in time to avoid the burns which he in fact received, or any part of them." However, we are satisfied that such evidence was furnished by the plaintiff's witnesses, or at least the jury could properly so find. We reject the defendants' point that at this stage of the proceeding Mr. Kanengieser's testimony "must be treated as worthless" because he admitted, during his cross-examination, that without looking it up he could not state the combustion point of Vaseline. The weight to be given to Mr. Kanengieser's testimony, when viewed in its entirety and coupled with the other evidence in the case, was for the jury rather than the court. The jury might reasonably find that the plaintiff's burns would have been minor but for the ignition of the confined vapors from the active ingredients in the Ben-Gay. The fact that it might be difficult to separate the precise extent of such minor burns from those ultimately suffered by the plaintiff should not preclude all recovery. See *Jenkins v. Pennsylvania R. R. Co.,* 67 *N. J. L.* 331, 334 (*E. & A.* 1902) :

"The situation is one that is not very unusual in actions of tort. It many times happens that the damage arising from an actionable injury chargeable to the defendant is, in the nature of things, or from the circumstances of the cases, indistinguishable from other damage occurring at the same time, attributable to the acts of an independent tortfeasor or to natural causes. In such cases, since the injured party cannot supply the materials necessary to enable the jury to make an exact computation of the damages in suit, the approved practice is to leave it to the good sense of the jury, as reasonable men, to form from the evidence the best estimate that can be made under the circumstances, as a basis of compensatory damages for the actionable injury."

Though the Appellate Division did not pass on the issue, the defendants advance the contention that the

"plaintiff failed to produce sufficient evidence to show that defendants' conduct was a proximate cause of the injury." As we have already indicated, the jury might reasonably have found from the plaintiff's favorable evidence that the defendants should have foreseen the danger of igniting the confined Ben-Gay vapors and should have warned users thereof. And the jury might also have reasonably found that if such warning had been given the plaintiff would have taken suitable precautions to avoid serious injury from burning. We consider wholly insubstantial the defendants' point that the "plaintiff's own testimony shows conclusively that such warnings, even if given, would not have avoided the injuries here suffered." The plaintiff testified that when he originally purchased Ben-Gay, upon recommendation of a druggist, he probably read its accompanying literature although he did not read it when subsequent purchases were made. His wife testified that she always read the legend on the package and was familiar with the directions which accompanied it. She was the one who actually applied the ointment and the jury could reasonably have found that if there had been an appropriate warning, precautions would have been taken to avoid serious burning. Proximate and intervening causes are ordinarily jury questions (*Brower v. New York C. & H. R. R. Co.*, 91 *N. J. L.* 190, 191 (*E. & A.* 1918)), and whether we apply the substantial factor concept (*Hartman v. City of Brigantine*, 42 *N. J. Super.* 247, 261 (*App. Div.* 1956), affirmed 23 *N. J.* 530 (1957)), or the test of foreseeability (*Mitchell v. Friedman*, 11 *N. J. Super.* 344, 347 (*App. Div.* 1951)), or the major tests advanced elsewhere (2 *Harper & James, supra,* at *pp.* 1132, 1151), we come to the firm conclusion that the trial court was not justified in ruling, as a matter of law at the close of the plaintiff's case, that there was no proximate causal relationship whatever between the defendants' alleged negligence in failing to warn of the danger of igniting the confined Ben-Gay vapors and the plaintiff's injuries. See *Menth v. Breeze Corporation, Inc., supra; Daniel v. Gielty Trucking Co.,* 116 *N. J. L.* 172 (*E. & A.* 1935).

The defendants urge that the plaintiff was guilty of contributory negligence. In dealing with this issue we must bear in mind that the plaintiff had no warning that the confined Ben-Gay vapors would burn with very high intensity and rapidity when ignited. See *Dillard & Hart, supra,* at *p.* 163. The jury could reasonably find that his action in undertaking to smoke after the Ben-Gay had been applied and covered by the pajama top, as well as his subsequent actions, did not fall below the standard to which he was required to conform for his own protection. See *Prosser, supra,* at *p.* 283. *Cf. Battaglia v. Norton,* 16 *N. J.* 171, 179 (1954) ; *Pangborn v. Central Railroad Co. of N. J.,* 18 *N. J.* 84, 93 (1955). The defendants assert that the plaintiff "was negligent as a matter of law in his choice of means for combatting the fire once it had begun." In retrospect it would have been wiser for the plaintiff not to have jumped up while still continuing his patting motion; but we cannot say that he acted any differently than the ordinarily prudent person would have acted in the emergent circumstances. We are satisfied that the trial court was in error in its view that the plaintiff was guilty of contributory negligence as a matter of law. See *Battaglia v. Norton, supra:*

"But contributory negligence is an affirmative defense to be proved; and ordinarily the issue is one for the fact-finding tribunal. Such is the case where different minds may reasonably come to different conclusions as to the facts or may reasonably disagree as to the inferences derivable from the facts, controverted or uncontroverted. *Kaufman v. Pennsylvania Railroad Co.,* 2 *N. J.* 318 (1950) ; *Mellon v. Pennsylvania-Reading Seashore Lines,* 7 *N. J.* 415 (1951) ; *Gudnestad v. Seaboard Coal Dock Co.,* 15 *N. J.* 210 (1954). Only in the clearest case of contributory fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for decisive action by the court. Care is to be taken that the reasonable man be not endowed with attributes which properly belong to a person of exceptional perspicuity and foresight. *Taneian v. Meghrigian,* 15 *N. J.* 267 (1954)." 16 *N. J.* at *page* 179.

In his brief, the plaintiff placed reliance on provisions of the Federal Food, Drug and Cosmetic Act (21 *U. S. C. A.,* §§ 321, 331, 352) and the Federal Trade Commission Act

(15 *U. S. C. A.*, § 52), as well as provisions of the Pure Food, Drug and Cosmetic Act of the State of Connecticut where the injuries occurred. See *General Statutes of Connecticut, chapter* 186, §§ 3929, 3930(*h*), 3944(*f*)(2). However, at oral argument he expressly acknowledged that, even under his own broad interpretation, these statutory provisions imposed no greater responsibility on the defendants than did the common law as determined earlier in this opinion. Accordingly we find no occasion for dealing with the cited statutory provisions. See 44 *N. J. Super.* at *page* 434. And we also find no occasion for dealing further with the extent of the tort liability of a distributor of a product as distinguished from the liability of a manufacturer. In the instant matter the defendant Thos. Leeming & Co., Inc., as the sole United States distributor, had independently arranged for a chemical analysis of the product and the joint brief which was filed on behalf of both defendants does not urge that the distributor's responsibility was here any less than the manufacturer's. See *O'Donnell v. Asplundh Tree Expert Co., supra; Cornelius v. B. Filippone & Co., Inc.,* 119 *N. J. L.* 540 (*Sup. Ct.* 1938); *Slavin v. Francis H. Leggett & Co.,* 114 *N. J. L.* 421 (*Sup. Ct.* 1935), affirmed 117 *N. J. L.* 101 (*E. & A.* 1936).

The judgment of the Appellate Division is reversed and the cause is remanded for trial in the Law Division.

WACHENFELD, J. (dissenting). I am to affirm the judgment below for the reasons expressed by Judge Clapp in the Appellate Division, 44 *N. J. Super.* 429 (1957).

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING and JACOBS—4.

*For affirmance*—Justice WACHENFELD—1.