58 N.J. Super. 29 (1959)
155 A.2d 277
HENRY J. CWIK, SR., GUARDIAN AD LITEM, ETC., PLAINTIFF-APPELLANT,
v.
LOUIS ZYLSTRA AND TESSIE ZYLSTRA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1959.
Decided November 5, 1959.
*30 Before Judge GOLDMANN, FREUND and HANEMAN.
*31 Mr. Frank G. Schlosser argued the cause for plaintiff-appellant (Messrs. Mackerly & Friedman, attorneys; Mr. William J. McGovern, on the brief).
Mr. John C. Stockel argued the cause for defendants-respondents.
The opinion of the court was delivered by FREUND, J.A.D.
Defendants, Louis Zylstra and his wife Tessie, were sued for negligence in allowing their grandson, Henry Cwik, Jr., (hereinafter "Jody") to fall into a pail of scalding water while the boy was in their care. The plaintiff is Jody's father and defendants' son-in-law, and he seeks to recover damages as parent per quod and as guardian ad litem of his son. This appeal is from the action of the Hunterdon County Court in granting a dismissal as to both defendants, upon motion made at the close of plaintiff's case. The action was brought upon the theory we accepted in Barbarisi v. Caruso, 47 N.J. Super. 125 (App. Div. 1957)  that a grandparent who has voluntarily undertaken to care for and supervise a child must exercise reasonable care in so doing.
So that they would be free to attend a high school reunion on Saturday night, June 22, 1957, Mr. and Mrs. Henry J. Cwik, Sr., entrusted their two boys, 4 1/2 year-old Frankie and 2 1/2 year-old Jody, to the maternal grandparents at the latters' dairy farm in the Township of Readington. The boys stayed at the farm over night. The Cwiks, who resided in High Bridge, had been thus accommodated by defendants on prior occasions. The grandparents were in control of the farm as lessees of the premises.
Defendants' answers to interrogatories, read into the record as part of plaintiff's affirmative case, state that cows were milked by them in the barn between 4:30 and 7:00 A.M. on Sunday morning, June 23. Jody was still asleep at this time. At about 9:00, however, Mrs. Zylstra was in the barn cleaning the milking machines and the milk pails. *32 She would first run cold water through the machines and then hot water. Mr. Zylstra was in the house having breakfast at the time. Mrs. Zylstra had drawn about seven quarts of scalding water from an electric water heater into a bucket. The bucket was 16" high and 12" in diameter and had a 12-quart capacity. She placed the bucket inside the doorway of the barn, to the side. Jody was now out of bed and dressed in a sunsuit.
A description of how the mishap occurred must come from defendants, as Jody and his brother were too young to testify and their parents were not present at the time. The parents, however, testified to admissions and explanations given them by the grandmother when she was pressed for the details.
The father testified he had a conversation with his mother-in-law at the farm while Jody was still in the hospital. The following is his testimony:
"Q. Did she say where  Did you ask her anything about where the pail was when Jody fell in? A. Yes, I did.
Q. And what did she say to you? A. In the doorway.
Q. In the doorway of what? A. Of the barn. She also said the kids had no business being there but she left them there, she knew they were there but she didn't think that that could happen.
Q. Did you ask her anything about or did she say anything about what the children were doing around the entrance way of the barn?
A. Playing.
Q. Did she say that? A. Yes, she did.
Q. Did she say anything about how they happened to be out there with her at nine o'clock on this Sunday morning? A. They went out with her when she went to wash the milk cans and the milk pails.
Q. Did she say anything about having told them not to come with her or asking them to go with her? A. No. She definitely told me that she said that she knew that they shouldn't be there, but she didn't tell them not to be there. That's just what she told me."
On cross-examination, plaintiff was asked about the report he received from Frankie.
"Q. And Frankie told you that he pushed Jody into the pail, didn't he? A. Frankie said that they both tried to get through the doorway.
*33 Q. And as a result of that Jody, the younger, got pushed and sat in the pail, didn't he? A. I don't know whether he got pushed or not. I wasn't there.

* * * * * * * *
Q. And that's what Frankie told you, that he accidentally pushed Jody backwards and Jody sat in the pail, didn't he? A. I can't tell you that Frankie said he pushed him in there. If he said that I would certainly tell you, but I can't recall Frankie saying [he] pushed him in the pail of water.
Q. In any event, you told us a little while ago that the report you got was that Jody went backwards. A. That's right.
Q. And that happened when the two boys tried to get through the door at the same time. A. That's right. That's the way I understood it."
Mrs. Cwik testified as to what her mother had told her:
"A. Well, she said the pail of water was there in the doorway and that both the children were there and they were running, I believe, through the barn and they both tried to get through the door together and Jody fell in the pail of water and she proceeded to take the clothes off of Jody, and that's the best I can remember."
The mother said on cross-examination that Frankie told her he and Jody "were trying to get through the door and they couldn't fit through the door and Jody landed into the pail of water." She said she never asked Frankie if he had pushed Jody.
The scald injuries to Jody were severe. Burns covered about 30% of his body surface. He was hospitalized for over two weeks. There was medical testimony that part of the burned area is permanently scarred.
The trial judge granted a dismissal as to Mr. Zylstra on the ground that "he had nothing whatever to do with the placing of the pail, the accident or anything." The dismissal as to Mrs. Zylstra was based on a finding that she could not have foreseen what happened and therefore was not negligent. Even if she were, the trial judge stated, the colliding of the boys in the doorway was an intervening proximate cause. The appeal requires a consideration of each of these rulings.
*34 A jury could reasonably conclude that Mrs. Zylstra was negligent in failing to discharge her duty to the children with due care. In view of the testimony that she knew the boys were playing in the area, that she knew they should not have been there, and that she did not attempt to warn them of the presence of the pail of scalding water, there was ample evidence from which the jury could have found that Mrs. Zylstra actually had or should have foreseen the potential of harm to the 2 1/2 year-old and that she did not thereafter act in a reasonably prudent manner. The appraisement of her conduct was clearly for the jury. It matters not whether the duty to exercise reasonable care flows from her status as grandparental baby sitter (Barbarisi v. Caruso, supra), or whether it springs from her status as a possessor of land who is conducting an activity thereon that is dangerous to a social guest. In connection with the latter basis of liability, see Berger v. Shapiro, 30 N.J. 89, 97 (1959); Cropanese v. Martinez, 35 N.J. Super. 118 (App. Div. 1955); Mistretta v. Alessi, 45 N.J. Super. 176, 179-80 (App. Div. 1957); Restatement, Torts, § 341, p. 929.
We also resolve the question of proximate cause in favor of the plaintiff. Frankie's colliding with Jody in the doorway, or even his pushing him, was doubtless an intervening force. But it is settled that a defendant is not relieved from liability where there is proof of his negligence, combined with some independent but foreseeable intervening cause. See, e.g., Martin v. Bengue, Inc., 25 N.J. 359, 371 (1957). "A tortfeasor is not relieved from liability for his negligence by the intervention of the acts of third persons, including the act of a child, if those acts were reasonably foreseeable." Menth v. Breeze Corporation, Inc., 4 N.J. 428, 441 (1950). Mrs. Zylstra knew the boys were playing and running around. That one would push the other in the direction of the pail was a foreseeable danger that should have been guarded against. This question also should have been submitted to the jury under proper *35 instructions. See Andreoli v. Natural Gas Co., 57 N.J. Super. 356 (App. Div. 1959).
So far as the infant's grandfather is concerned, the answers to interrogatories state that both defendants were to take care of the children. Yet Mrs. Cwik testified that she had not asked her father to baby sit on the occasion in question. It will be recalled that at the time of the accident he was in the house eating breakfast. But whether or not he voluntarily assumed any duty to care for the children is not important. In our judgment, reasonable minds could come to but one conclusion  that the grandfather was justified in assuming that the children were being properly cared for by the grandmother. There being no indication in the proofs that he should have considered his wife incompetent to baby sit by herself for a few moments, we are convinced that his conduct was not unlike that of a reasonably prudent person. Hence, unless some basis exists for charging Mr. Zylstra with the negligence of his wife, the trial judge ruled correctly in dismissing the case against him.
Plaintiff argues that on this phase of the case, it is meaningful to make the point that the defendants, as possessors of land, failed to exercise reasonable care in protecting their licensee from a dangerous activity. It is urged that the dairy operation was concededly a joint enterprise and that joint control of the farm was admitted. The grandmother's negligence in carrying on a dangerous activity is said to be imputable to her husband since she was acting for herself and for him in sterilizing the milking equipment. Compare Harrington v. Jagmetty, 83 N.J.L. 548, 550 (E. & A. 1912). It should be noted, in passing, that by statute a husband is not liable for his wife's torts, "except in cases where he would be jointly responsible with her if the marriage did not exist." R.S. 37:2-8. And of course the mere relation of husband and wife does not create an agency. Barber v. Hochstrasser, 136 N.J.L. 76, 80 (Sup. Ct. 1947); Restatement, Agency 2d, § 22, p. 94.
*36 However valid the theory of joint enterprise might be, our view is that what happened in the present case was not the type of risk that should fall upon the enterprise of operating a dairy farm. Although the placing of the open bucket near the doorway of the barn undeniably occurred during the prosecution of a joint enterprise in which both defendants had a common interest and in which Mr. Zylstra had the equal right to direct and control the conduct of his wife, compare Mack v. Mackiewicz, 9 N.J. Misc. 1219, 157 A. 117 (Sup. Ct. 1931), followed in State ex rel. McCrory v. Bland, 355 Mo. 706, 197 S.W.2d 669, 168 A.L.R. 929 (Mo. Sup. Ct. 1946), the pail of hot water had to be, in the nature of things, in the barn where the milking equipment was located. If negligence were predicated only on the grandmother's placement of the pail, there would then be, in view of the utility of that procedure and the absence of any practicable alternative location for the pail, a serious doubt as to whether the trial judge was not right in all respects. But what made the situation unreasonably dangerous is the conduct of Mrs. Zylstra in permitting the children first to come into such close proximity to the scalding water and then in failing to give them a warning. No reason suggests itself why the risk of harm from these defaults should be borne by the enterprise, and if such is the case, no logical reason exists to impute the grandmother's negligence to her husband.
The judgment is affirmed as to Mr. Zylstra but reversed and remanded for a new trial as to Mrs. Zylstra.